**O'MELVENY & MYERS LLP**
David S. Almeling (*pro hac vice* application forthcoming)
dalmeling@omm.com
Christopher B. Phillips (*pro hac vice* application forthcoming)
cphillips@omm.com
Two Embarcadero Center, 28th Floor
San Francisco, California 94111-3823
Telephone:    (415) 984-8700
Facsimile:    (415) 984-8701

Patrick V. Plassio (*pro hac vice* application forthcoming)
pplassio@omm.com
2801 North Harwood Street, Suite 1600
Dallas, Texas 75201-2692
Telephone:    (972) 360-1900
Facsimile:    (972) 360-1901

**DLA PIPER LLP (US)**
Cameron A. Fine (Bar No. 029331)
cameron.fine@us.dlapiper.com
Madeline A. Cordray (Bar No. 035788)
madeline.cordray@us.dlapiper.com
2525 East Camelback Road, Suite 1000
Phoenix, Arizona 85016
Telephone:    (480) 606-5100
Facsimile:    (480) 606-5101

*Attorneys for Plaintiff*
*Contractor Management Services, LLC d/b/a Openforce*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Contractor Management Services, LLC d/b/a Openforce, | CASE NO. |
| Plaintiff, | **PLAINTIFF'S COMPLAINT AND JURY DEMAND** |
| v. | |
| Para, Inc. d/b/a GigSafe; David Pickerell, | |
| Defendants. | |

Plaintiff Contractor Management Services, LLC d/b/a Openforce ("Openforce"), an industry leader in contractor management software that helps contracting companies manage their independent contractor vendor relationships and comply with labor regulations and assists independent contractors with managing their businesses, files this Complaint against Defendants Para, Inc. d/b/a GigSafe ("Para" and "GigSafe," respectively) and David Pickerell (collectively with GigSafe, "Defendants") in the above-entitled action and states as follows:

## INTRODUCTION

1.     Plaintiff Openforce brings this action to stop and to remedy the significant harms caused by a deliberate, ongoing, and unlawful scheme in which Para, now known as GigSafe, and its founder and CEO, Mr. Pickerell, hacked into Openforce's systems, pilfered Openforce's trade secrets, and used that information to steal Openforce's customers.  Specifically, as recently as yesterday, GigSafe and its personnel, at the direction of Mr. Pickerell, through fraud and tortious interference, improperly accessed Openforce's software systems, and customer-specific workflows, management tools, and more.  In doing so, GigSafe and its personnel misappropriated Openforce's trade secrets and confidential information in an unlawful attempt to lure away Openforce's customers.

2.     Started by Mr. Pickerell in late 2020, Para advertised an app for gig-economy workers, like delivery drivers, that purported to provide price transparency and a one-stop shop for managing work they performed for gig-economy companies like DoorDash and Uber.  But Para's app suffered from a major problem—it depended on Para unlawfully exploiting data from these gig-economy companies.  After catching wind of this, both DoorDash and Uber took steps to halt Para's unlawful actions, including by implementing additional technical safeguards to stop Para's actions.  While these defenses caused Para to give up on this particular business model, it did not stop Mr. Pickerell and Para from hatching a new conspiracy: rebrand Para as GigSafe, hack into Openforce's systems, steal its trade secrets and confidential information, and build a copycat platform to lure away Openforce's customers.

3.      In pursuit of this scheme, and on information and belief, Para and Mr. Pickerell feigned interest in a potential corporate transaction with Openforce in 2023. To solicit Openforce's confidential information, Mr. Pickerell claimed that Para needed substantive, detailed information about Openforce's business model, competitive strategies, and clients to better evaluate the contemplated Openforce–Para business transaction. At an in-person meeting in Arizona between both sides' leadership, including Mr. Pickerell, in October 2023, Openforce shared information about its business pursuant to a non-disclosure agreement, including its pricing strategy, operating mechanics, insurance offerings, three-legged stool strategy, strategies to mitigate labor misclassification risks when retaining independent contractors, and revenue models. But these talks were only a front for Mr. Pickerell's and Para's ploy—to learn enough about Openforce so they could take Openforce's trade secrets to compete with Openforce through their rebranded venture, GigSafe. Openforce knows now that Para and Mr. Pickerell had already covertly launched GigSafe the month before those talks, though on information and belief, GigSafe's existence at this time was not public. GigSafe now operates as one of Openforce's direct competitors.

4.      Defendants' scheme did not end there. Since November 2023, and continuing to this day, GigSafe's personnel have lied about their identities and intentions to access Openforce's software system, which has allowed Defendants to misappropriate more of Openforce's proprietary, customer-specific enrollment and workflow information, insurance offerings, payment plans, system mechanics, and client admin interface designs. Openforce's internal logs reflect that at least six different GigSafe employees on over 20 separate occasions improperly accessed Openforce's platform by misrepresenting themselves as would-be independent contractor drivers for at least ten Openforce clients.

5.      Once they had access to Openforce's proprietary software platform, GigSafe's employees spent days iteratively "enrolling" and/or "onboarding" through Openforce's workflows and thereby extracting everything they could about Openforce's technology and trade secrets, including Openforce's proprietary enrollment and

onboarding workflows, specific customers' requirements, insurance structures, payment procedures, and the overall system design.  Openforce has to date uncovered Defendants' scheme involving ten of its customers:

| Openforce Customer (Identified by Pseudonym[1]) | Customer's Services | GigSafe Employee Fraudulently Registering for or Accessing Customer's Platforms |
|---|---|---|
| "Customer A" | Same-day delivery of construction parts | Valery Kochetkov (Director of Engineering)<br><br>Jimmy Thompson (Business Development)<br><br>Jessica DiGulio (Operations) |
| "Customer B" | Same-day courier | Jimmy Thompson |
| "Customer C" | Supply chain management | Jimmy Thompson |
| "Customer D" | Retail intelligence and merchandising | Jimmy Thompson |
| "Customer E" | Same-day courier | Jimmy Thompson |
| "Customer F" | Medical courier | Jimmy Thompson<br><br>Daniel Gerow (Compliance and Insurance) |
| "Customer G" | Courier | Daniel Gerow |
| "Customer H" | Courier | Jimmy Thompson<br><br>Daniel Gerow |
| "Customer I" | Courier | Daniel Gerow<br><br>Megan Hicks (Client Manager) |
| "Customer J" | Freight shipping and delivery | Daniel Gerow<br><br>Amanda Tomkins (Product & Customer Success) |

6.    On information and belief, the GigSafe employees funneled Openforce's trade secrets to Defendants, who used them to create a competing system and copy Openforce's customer specific workflows, enrollment and on-boarding platform, insurance

---

[1] To protect its customers, Openforce uses these pseudonyms when referring to them in this Complaint.

offerings, and compliance strategies.  GigSafe then used its competing system built on ill-gotten gains to solicit Openforce's customers.  On information and belief, this scheme induced some of Openforce's customers to leave Openforce for GigSafe's illegal copycat product.  GigSafe now boasts on its website that two of the companies from the chart above—formerly Openforce customers whose accounts on the Openforce system GigSafe hacked, accessed, and stole from—are now GigSafe clients.

7.    To remedy the wrongs committed by Para/GigSafe and Mr. Pickerell, and to prevent future ones, Openforce brings this action for misappropriation of trade secrets under federal and Arizona law, tortious interference with contract, tortious interference with business expectancy, fraudulent misrepresentation, fraudulent inducement, unfair competition, breach of contract, and unjust enrichment.

## PARTIES

8.    Plaintiff Openforce is a Nevada limited liability company with its principal place of business in Scottsdale, Arizona.

9.    Defendant Para is a Delaware corporation with, on information and belief, its principal place of business in San Francisco, California.  It currently operates under the trade name GigSafe.

10.    Defendant Mr. Pickerell is an individual who, on information and belief, is a citizen of the State of Texas, residing at 7501 Newhall Lane, Austin, Texas 78746.

## VENUE AND JURISDICTION

11.    The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331 for Openforce's claims under 18 U.S.C. §§ 1836–39, *et seq.*, for misappropriation of trade secrets under the Defend Trade Secrets Act.  The Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the remaining claims for violating the Arizona Uniform Trade Secrets Act under Arizona Revised Statutes 44-401, *et seq.*, tortious interference with contract, tortious interference with business expectancy, fraudulent misrepresentation, fraudulent inducement, unfair competition, breach of contract, and unjust enrichment because they involve a common nucleus of operative fact.

12.     Venue and personal jurisdiction are proper because a substantial portion of the events and omissions giving rise to this lawsuit occurred in this District.  These events and omissions include Mr. Pickerell directing Para to enter into, and Para entering into, a Mutual Non-Disclosure Agreement ("MNDA") with Openforce, a company with its principal place of business in this District.  A true and correct copy of the MNDA is attached hereto as Exhibit A.  In Scottsdale, Arizona, Openforce and Para held a key meeting, which Mr. Pickerell attended in person, to discuss Openforce's business; there, Openforce disclosed to Para and Mr. Pickerell sensitive details about its business and offerings pursuant to the MNDA.  The MNDA contains a mandatory forum selection clause designating "State and Federal Courts located in Phoenix, Arizona" as the exclusive venue for any action arising out of the MNDA.  Ex. A § 5.  The MNDA directs that the parties agree to "submit to the personal jurisdiction of such courts."  *Id*.  The events and omissions in this District further include, on information and belief, Defendants' actions to (a) misappropriate the confidential and trade secret information of Openforce, a company with its principal place of business in this District, including by soliciting this information at the October 2023 meeting with Openforce that took place in this District; (b) breach the Arizona-based MNDA; (c) tortiously interfere with and unfairly compete for business from Openforce's customers, who do business in this District; (d) misrepresenting their true intentions and identities to access the systems of Openforce, a company with its principal place of business in this District; and (e) fraudulently inducing Openforce to enter into the MNDA with Para and to share trade secrets and other confidential information pursuant to the MNDA at a meeting in Scottsdale, Arizona.

## **FACTUAL BACKGROUND**

### **A.    Openforce and Its Trade Secrets.**

13.     For over twenty years, Openforce has offered software-enabled solutions that serve contracting companies utilizing independent contractor workforces and independent contractors.  Contracting companies trust Openforce's ability and tools to mitigate the risk of labor misclassification, pay their independent contractors, and facilitate insurance

offerings for their independent contractors. And both contracting companies and independent contractors value Openforce's industry-leading platform because it covers all aspects of independent contractor management, including onboarding, regulatory compliance, risk management, rate negotiation, insurance, invoicing and settlement processing. Openforce serves clients in many industries, with an emphasis on transportation, including courier, last-mile delivery, and trucking.

14. In its software deployment process, Openforce develops with its clients a workflow "blueprint" and offers each of its clients a customizable Workflow Designer. This proprietary software tool allows companies to tailor their processes for on-boarding (or "enrolling") new independent contractors. These processes involve customized "workflows" appearing on each company's protected Openforce portal, which can vary depending on the customer's size, industry, business strategies, and many other factors specific to the customer's business. Customers value Openforce's Workflow Designer for its comprehensiveness, flexibility, and near infinite combinations of workflows. And each customer receives dedicated Openforce support and service to help design, refine, and update a workflow molded to its needs. These workflows and the materials contained in them (often called a blueprint) are a critical component of Openforce's offerings. They enhance Openforce's clients' ability to contract, manage, and retain the best independent contractors by state, city, zip code, vehicle size, and compliance-item requirements by industry and work performed, while maximizing the clients' efficiency.

15. These bespoke customer workflows go hand-in-hand with Openforce's Contractor Management Platform, Manage (formerly IC Manage). Through Manage, Openforce's customers can streamline key aspects of their relationship with their independent contractors in ways that Openforce has fine-tuned over decades. Manage allows Openforce clients to supplement their conventional recruiting methods by accessing Openforce's database of proven independent contractors. It empowers them to onboard independent contractors through the bespoke workflows discussed above. It interplays with benefits for independent contractors by setting up personal risk insurances and

6

businesses.  And it offers unique and reliable guidance for Openforce's clients to untangle a complex web of compliance regulations, giving them confidence in their compliance categorizations.

16.    Openforce has spent decades and invested many millions of dollars into the research and development of its software systems, including Manage, the Workflow Designer, and related enrollment offerings; it has layered features and complexity atop that offering every year for the past 24 years.  To improve its offerings, Openforce has collaborated with each of its customers, listened to feedback, and conducted expensive and expansive market research.  The results are impressive.  In the past year alone, Openforce has been decorated with dozens of industry awards, including GetApp "Contractor Management" Category Leaders Award (2024 and 2025), and Capterra "Entity Management" and "Trucking" Best Value Awards (2024), and a plethora of recognitions from well-known software marketplace, G2, including "Insurance Compliance" Leader, Most Implementable, Best Support, High Performer, and Highest User of Adoption Awards (2024 and 2025).  In 2022, Openforce's Insurtech solution earned multiple Stevie Awards, the world's premier business awards, in the categories of "Technical Innovation of the Year," "Emerging Technology," "Insurance Solution," and "Achievement in Product Innovation."  Openforce was named to the Inc. 5000 list of America's fastest-growing private companies in both 2024 and 2025, and ranked No. 122 on the 2025 Inc. Regionals Southwest list with 40% 2-year growth, up from No. 162 in 2024.

17.    Openforce's continued success (as with most software companies) depends on the intellectual property underlying its platform, which Openforce goes to great lengths to protect.  For example, Openforce's trade secrets and confidential information span a wide variety of operations and business activity, including customer preferences and requirements for enrolling independent contractors in their systems, which manifest in customers' tailored enrollment workflows that meet their own individual needs; these trade secrets and confidential information similarly include the product that Openforce makes available to its customers, rendered in Manage and Openforce's other systems as, among

other things, workflows containing the necessary steps that legitimate independent contractors take to enroll to do business with one of Openforce's customers. These trade secrets and confidential information further include: customer-specific pricing; the customer's terms of engagement; customer onboarding requirements; workflow-development records, processes, and procedures; strategies for insurance and regulatory compliance regarding the independent-contractor relationship; process checks for verifying enrollees' identities and background information; company/contractor agreements; contractor/Openforce agreements; independent contractor decision documentation; insurance plan structures and their underlying forms; contractor payment processes and forms; and state-by-state variations regarding the above. These trade secrets and confidential information also include Openforce's best practices and strategies for working with independent contractors, manifested throughout the Manage software, which includes specific processes for regulatory compliance, onboarding, recruiting, and benefits. Openforce's trade secrets and confidential information also include the technological information that enable Openforce's industry-leading platforms, including functionalities, schematics, and diagrams of Openforce's software systems, including (a) Workflow Designer, as well as the resulting selection and arrangement of workflows it makes available to its customers, (b) Manage, and (c) Openforce's tailored and non-public administrative interfaces available only to clients with the necessary login credentials to access them. These trade secrets and confidential information further include the trial and error (both positive and negative) that Openforce undertook to create these trade secrets. All of these trade secrets and confidential information described in this paragraph (collectively, the "Trade Secrets") are related to products or services that Openforce uses in, or intends to use in, interstate or foreign commerce (they are available in all 50 states and in Canada), including Workflow Designer and Manage. Openforce also uses its Trade Secrets to market, promote, and sell products that themselves incorporate the Trade Secrets to customers across the United States and abroad.

18.     Openforce's Trade Secrets derive considerable value from not being publicly known outside of Openforce.  They derive independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use.  The secrecy of the Trade Secrets gives Openforce a competitive advantage and contributes to how Openforce's products and technology stand out from that of its competitors.  For example, based on its Workflow Designer, Openforce can quickly build and deliver robust, easy-to-use platforms for customers that its competitors cannot match; the public disclosure of this technological information or its use by competitors would allow Openforce's competitors to narrow the wide gap between them and Openforce.  As another example, Openforce's regulatory compliance guidance in Manage reflects streamlined and curated business intelligence that draws in clients, who cannot obtain guidance as accurate and as digestible in the public domain.  Similarly, the secrecy of each Openforce customer's tailored workflows, business operations, insurance programs, and compliance strategies has independent economic value; if Openforce's competitors had access to Openforce's materials memorializing this valuable information, including the needs for each customer, those competitors could unfairly do what Defendants did here—violate contracts and laws to create a copycat product to siphon customers away from Openforce.  Actions like these damage Openforce's market share and reputation as a leader in this space, undermining that goodwill that Openforce created.

19.     Openforce takes reasonable steps to protect its Trade Secrets from disclosure.  These steps include policies and procedures regarding employees, third parties, electronic protections, and physical security.  One such step is to require Openforce employees to sign a confidentiality agreement as a condition of employment.  Among other things, these agreements generally require employees with access to Openforce's Trade Secrets to:

- not disclose or use Trade Secret information without Openforce's prior consent;

- • use Openforce's Trade Secret information only for the benefit of Openforce;
- • return all company property, including Trade Secret information, immediately upon termination of employment; and
- • assign any inventions or intellectual property developed in the course of their employment to Openforce.

In addition, agreements for employees granted Openforce stock options contain similar confidentiality obligations.

20. Furthermore, Openforce limits access to the Trade Secrets through actions and procedures designed to prevent any unauthorized use or disclosure. For example, entry into Openforce's facilities is controlled and limited. Openforce protects its IT systems with passwords and unique login credentials. It monitors them with security personnel and software; once again, access is limited to only authorized individuals. Openforce also maintains other network protections to prevent unauthorized external access, including firewalls, encryption, and cyber security software.

21. Openforce maintains employee policies that express the importance of confidentiality and prohibit unauthorized actions regarding confidential information. Openforce also trains its employees concerning the importance of maintaining confidentiality.

22. When disclosing any Trade Secrets to third parties like customers and their independent contractors, Openforce requires these third parties to execute agreements with strict provisions preventing any unauthorized use or disclosure of any Openforce Trade Secrets. These measures apply to Openforce's finished products made available to its customers in its systems, including the necessary steps that legitimate independent contractors must take to enroll to work for one of Openforce's customers. In addition, Openforce uses a unique, customer-specific activation code that Openforce provides to each of its customers to restrict the ability of a real independent contractor to access these

steps and enroll to work as an independent contractor for one of Openforce's customers, to view and negotiate agreements, to enroll in insurance products, to document business decisions, to view customer onboarding requirements, to complete identity verifications and background checks, and to do business with Openforce's customers.

**B.**  **Para Hatches a Plan to Hack into Openforce's Platform and Steal Trade Secrets and Customers.**

23.    Founded in September 2020 by Mr. Pickerell, Para offered an app to independent contractors working in the gig-economy.[2]  Para marketed this app as providing visibility into these independent contractors' potential take-home pay when working on short-term contracts or freelance work.  The app claimed to be a one-stop-shop where drivers could see inputs from multiple apps (such as Uber, Lyft and DoorDash) all in a single place before accepting a job.  But, on information and belief, Para's business model revolved around deceit.  Specifically, and on information and belief, the app required improperly accessing and misusing data from a roster of gig-economy companies, including DoorDash and Uber.  Para's actions led DoorDash in August 2021 to send Para a cease-and-desist letter.  The letter demanded that Para cease using drivers' DoorDash credentials to access the DoorDash platform, which DoorDash attributed to destabilizing the platform multiple times.  According to reports, DoorDash attempted to stop Para by tightening security around drivers' credentials, but Para kept finding work-arounds, forcing DoorDash to escalate its response.  In the fall of 2022, Uber also sent Para a cease-and-desist letter, which, on information and belief, raised similar issues.  In the face of this resistance, on information and belief, Para abruptly shut down its app and abandoned the many independent contractors who had come to rely on it.

24.    With Uber and DoorDash pushing back, Para and Mr. Pickerell searched for their next target.  Given Openforce's role as an industry leader in the contractor management space (an industry adjacent to the one occupied by DoorDash and Uber),

---

[2] Erin Griffith, *Meet the App That Helps Gig Workers Know How Much They Really Make*, New York Times (October 11, 2022), https://www.nytimes.com/2022/10/11/technology/gig-workers-drivers-para-app.html.

Openforce was soon in Para's crosshairs. On information and belief, Defendants put their plan into action in June 2022 when Para employee Jimmy Thompson created an Openforce account posing as an independent contractor. On information and belief, Para, Mr. Pickerell, and Mr. Thompson did so with the intention of infiltrating Openforce's system, so that they could learn how Openforce operates and create a competing company.

25.    The plan did not get far at first, thanks to Openforce's structure and security systems. For example, Openforce restricts access to its on-boarding and enrollment platform to potential independent contractors selected by Openforce's clients. Openforce achieves this protection by limiting access to the enrollment platform to those with a customer-specific activation code. When entered, an activation code allows an independent contractor to access the enrollment workflow for the specific customer who provided that code. Use of these codes and access to these systems is authorized only by actual independent contractors seeking work with Openforce's customers. Using activation codes to access the particularized workflows of any customer for any other purpose—such as to misappropriate Openforce's Trade Secrets—is forbidden by an end user license agreement, to which all would-be contractors must agree before accessing Openforce's system to begin on-boarding. So Para and Mr. Pickerell devised a scheme to improperly access Openforce's Trade Secrets, including by obtaining Openforce's activation codes and then lying about their true intentions for using them. On information and belief, Para and Mr. Pickerell began doing just that.

26.    In April 2023, Para and Mr. Pickerell escalated their plan at the Express Carrier's Association conference, where they first got in touch with Openforce. Unaware of Para's problematic past and its ploy, Openforce stayed in touch with Para throughout that summer and arranged an in-person meeting in October 2023 with Openforce's CEO, Chairman of the Board, and CTO to discuss next steps for a potential corporate transaction.

**C.    To Gain Access to Openforce's Trade Secrets, Para Enters into a Non-Disclosure Agreement With Openforce.**

27.    Before the October 2023 meeting, Openforce required Para to execute the MNDA, as is its practice.  *See* Ex. A.  This agreement provided that sensitive, confidential information would be shared by both parties to allow them to evaluate a potential business relationship.  The parties further agreed that the MNDA "shall be binding upon the Parties, their assigns, successors in interest, administrators, or representatives."  Ex. A, § 6(b).

28.    With respect to confidential information, Openforce and Para agreed in the MNDA that:

> the Receiving Party, and any of its affiliates, parents, subsidiaries, and their respective employees, vendors, agents, officers, directors, and owners **shall not disclose the Confidential Information of the Disclosing Party and shall not use the Confidential Information of the Disclosing Party for any purpose other than expressly permitted by the Disclosing Party**. Such prohibited uses of the Confidential Information include but are not limited to: (i) **to compete directly or indirectly with the Disclosing Party**; (ii) **to develop products or services competitive with those of the Disclosing Party**; or (iii) to assist any third party in any of the foregoing. Disclosure of the Confidential Information of the Disclosing Party by the Receiving Party shall be limited to the Receiving Party's legal counsel and only the employees of the Receiving Party who have a need to know such Confidential Information and are bound in writing by confidentiality terms no less restrictive than those contained herein. Neither party has any rights to the patents, copyrights, trade secrets, trade names, trademarks, or service marks (whether or not registered), or any other rights, franchises or licenses of the other, unless otherwise agreed between the parties in a separate written agreement. Neither party shall modify, create derivative works from, reverse engineer, reverse assemble, decompile, or reverse compile any software or other material contained in the Confidential Information of the other party.

Ex. A, § 1(b) (emphasis added).

29.    The MNDA contained a non-solicitation provision, under which the

> Parties agree[d] to support and protect each other's efforts in performance of this Agreement by refraining during the life of this Agreement plus six months from any direct or indirect contact or solicitation of any customers, employees or opportunities introduced to one Party by the other Party. This

explicitly excludes any customers or opportunities the Parties have previously engaged with or been presented and any employees responding to a publicly posted job opening so long as such employee was not solicited.

Ex. A, § 2.

30.    To date, no party has terminated the MNDA; it remains in effect.  Ex. A, § 3.

31.    Discussions between Openforce and Para continued.  During September 2023, Openforce's Chief Product Officer and VP of Marketing and Partnerships met with Mr. Pickerell and Jessica DiGulio, a Para operations employee.  Openforce shared an overview of Openforce's products and services.

32.    These discussions continued, including at an in-person meeting on October 19, 2023 in Scottsdale, Arizona.  Mr. Pickerell and a deputy attended for in-person Para, while Openforce's CEO, Chairman of the Board, and CTO attended for Openforce.  At this meeting, and pursuant to the MNDA, Openforce shared detailed and confidential business plans, growth strategies, insurance information, and its revenue models.

33.    The meeting between Openforce and Para seemed to end on a positive note; however, less than two weeks later, Para told Openforce that it had no interest in proceeding.  The parties held a final discussion on November 7, 2023, at which the parties went their separate ways.

**D.    Following the Meeting with Openforce, Para and Mr. Pickerell Rebrand Para as GigSafe and Enlist GigSafe's Employees to Fraudulently Access Openforce's Trade Secrets.**

34.    While Para was meeting with Openforce, Mr. Pickerell had already started rebranding Para as GigSafe.  According to Mr. Pickerell's LinkedIn profile, he started GigSafe in September 2023—a month before meeting with Openforce's most senior leaders about a potential business transaction.  Corporate records show Para began operating under the GigSafe trade name on December 1, 2023.

35.    With a new name, Para and Mr. Pickerell tried to shed their history of wrongdoing and pivot from a product that took from the likes of Uber and DoorDash to

one that unfairly and unlawfully relied on stolen trade secrets to compete against Openforce.

36.     New identity in place, Mr. Pickerell and GigSafe implemented the next step in their scheme, in which GigSafe employees created accounts with Openforce by masquerading as independent contractor drivers seeking work from Openforce's clients—just as they had attempted with Mr. Thompson in June of 2022.  But this time was different, because Mr. Pickerell was now armed with information learned from Openforce under the MNDA.  As a result, on information and belief, GigSafe and Mr. Pickerell knew how to get these employees "inside" Openforce's systems by posing as independent contractors and procuring customer-specific activation codes.  Once inside, the GigSafe actors could access Openforce's Trade Secrets in the form of its customer-specific workflows and, by implication, the underlying Workflow Designer that Openforce uses to build them.  Over the next year and a half and on information and belief, GigSafe and Mr. Pickerell misused the activation codes for at least ten Openforce customers, as detailed below.

37.     On November 8, 2023, GigSafe employee Daniel Gerow, responsible for GigSafe's compliance and insurance, created an account in furtherance of this plan.  On January 16, 2024, three additional GigSafe employees—Ms. DiGulio, Mr. Thompson, and Valery Kochetkov (GigSafe's Director of Engineering)—did the same.  And yesterday, May 13, 2025, two additional GigSafe employees created accounts in furtherance of this plan—Amanda Tomkins (Product & Customer Success) and Megan Hicks (Client Manager).  All six GigSafe employees did so by posing as independent contractors.  On information and belief, each of these six GigSafe employees registered for accounts at the direction of GigSafe and Mr. Pickerell and were acting within the scope of their employment and for the benefit of their employer, GigSafe, in doing so.

38.     GigSafe—through   Mr.   Thompson,   Mr.   Gerow,   Ms.   DiGulio, Mr. Kochetkov, Ms. Tomkins, and Ms. Hicks—then took the next step in their plan, entering customer activation codes and going through the enrollment process and accessing the Openforce systems for the following Openforce customers:

- *"Customer A":* On January 16, 2024, Mr. Kochetkov became the first known GigSafe employee to enroll with an Openforce Client.  He did so by pretending to be an independent contractor "Delivery Partner" for an Openforce client, Customer A, a same-day delivery company for construction parts.  Doing so granted him access to Customer A's custom designed enrollment workflows on the Openforce platform.  On January 23, 2024, Mr. Thompson followed suit, enrolling as a "Delivery Partner."  On February 9, 2024, DiGulio did the same. Nearly one year later, Mr. Thompson again enrolled as a "Delivery Partner" for Customer A, this time using the Openforce account he had created on June 21, 2022, with his Para email address.  Upon gaining entrance, these three GigSafe employees soaked up Openforce's workflows and documents.  For example, during the January 23, 2024, enrollment, Mr. Thompson spent hours clicking through Customer A's "Delivery Partner" enrollment workflow, accessing and viewing Openforce's compliance, payment, and insurance documents, many of which reflect Openforce's sensitive Trade Secrets.  The insurance documents viewed by Mr. Thompson, for example, reflect Openforce's unique, industry-leading offerings, which took years to develop.  As part of this process, Mr. Thompson signed an independent contractor agreement with Company A, misrepresenting that he would be performing services for Customer A.  And demonstrating that he was working at the direction of GigSafe and Mr. Pickerell, Mr. Thompson in an insurance coverage form identified Mr. Pickerell—his "Work Colleague"—as the policy's beneficiary:



- *"Customer B":* On February 6, 2024, Mr. Thompson returned to Openforce's platform, where he enrolled as a "Contractor" for another Openforce client, Customer B, a same-day courier service. This time, Mr. Thompson used the Openforce account he created in June 2022 with a Para email address. Mr. Thompson spent over three hours scouring the enrollment process and Openforce's customized workflows for Customer B. He again signed a document misrepresenting that he operated his own "independent business" and that he was "providing service for or in connection with" Company B "as an independent contractor." Over these several hours, Mr. Thompson completed Customer B's workflow multiple times, even though the typical independent contractor only completes the workflow once—going through the workflow multiple times would allow him to test Openforce's workflows and gain more information to benefit GigSafe. For example, using alternative inputs, he could see alternative results, obtaining a fuller understanding of the entirety of the workflow. As with Customer A, Mr. Thompson also filled out an insurance form identifying Mr. Pickerell—referred to this time as "El Jefe"—as the beneficiary.



- *"Customer C":* On March 7, 2024, Mr. Thompson enrolled twice as a "Motor Carrier" for Customer C, a supply chain management firm, using two different accounts associated with a Para email address. As with his enrollments for Customers A and B, Mr. Thompson spent several hours over several days iteratively accessing Openforce's proprietary workflow and viewing payroll and insurance documents. Mr. Thompson specifically identified "Para Inc." as his

employer and the entity that would contract with Customer C.  Mr. Thompson repeatedly returned to the enrollment system in the following months—he has done so as recently as April 28, 2025.

- *"Customer D":* In early April 2024, Mr. Thompson used an Openforce account that he created with his GigSafe email a few weeks prior to fraudulently enroll as a "Field Representative" for Customer D, a retail intelligence and merchandising service company.  Mr. Thompson again signed up for insurance as an "Independent Contractor" for Customer D.  As usual, Mr. Thompson listed Mr. Pickerell as the beneficiary on this form.  This time, Mr. Thompson identified Mr. Pickerell as his "Boss," suggesting that Mr. Thompson fraudulently accessed Openforce's proprietary platform at the direction of his boss, Mr. Pickerell, and for the benefit of his employer, GigSafe.



- *"Customer E":* On April 12, 2024, Mr. Thompson created another new Openforce account, this time with a Para email address.  That day, Mr. Thompson used the Openforce account he created on January 16, 2024, with a personal email address to enroll as an "Independent Contractor – Courier" for Customer E, a same-day courier service.  He spent over an hour going through the enrollment for Customer E, learning how Openforce configured the workflow for Customer E and substance of customer-specific documents.  On April 15, 2024, Mr. Thompson created another Openforce account with a different GigSafe email address.  He used this account to enroll for a second time as an "Independent Contractor – Courier" for Customer E.  That day, he used his

Openforce account created on April 12, 2024, with a Para email address to enroll as an "Independent Contractor – Courier" for Customer E for a third time.

- *"Customer F":* On April 16, 2024, Mr. Thompson enrolled as a "New Contractor (CBC & DS)" for Customer F, a medical courier service, using the Openforce account he created on April 12, 2024, with a Para email address. Just over one week later, on April 25, 2024, he enrolled as a "New Contractor" for Customer F, using the Openforce account created on March 20, 2024, with his GigSafe email address. And on April 26, 2024, he enrolled again as a "New Contractor" for Customer F, using an Openforce account he created on June 21, 2022, with a Para email address. Mr. Thompson spent over three hours enrolling during this final process. He filled out a W-9 form on behalf of "Para Inc." listing a San Francisco address associated with Para and Mr. Pickerell. He filled out an auto insurance form again listing this San Francisco address. He once again listed this San Francisco address in an occupation accident insurance form, in which he identified the beneficiary "David Pickleson" [sic] at "1800 E 13th Street, Austin, TX." Mr. Thompson identified Mr. "Pickleson" [sic] as a "Stepchild." Mr. Thompson also filled out a "Logistics-Carrier Agreement" between Customer F and "Para Inc.," listing again the San Francisco address associated with Para and Mr. Pickerell. Around this same time, on April 24, 2024, a separate GigSafe employee, Mr. Gerow, also enrolled as a "New Contractor" for Customer F, using the Openforce account he created on November 8, 2023. He proceeded through several of the proprietary enrollment steps, which included gaining access to and viewing Customer F's "Requirements" for independent contractors. Finally, on June 28, 2024, Mr. Thompson enrolled for a third time as a "New Contractor" for Customer F, using an Openforce account he created on June 21, 2022, with a Para email address.
- *"Customer G":* On August 21, 2024, Mr. Gerow enrolled as a "Direct IC Owner Operator" for Customer G, a courier service. Mr. Gerow spent approximately

40 minutes going through various workflows, filling out and viewing insurance enrollment forms and agreements with Customer G.

- *"Customer H":* On October 13, 2024, Mr. Thompson enrolled as a "Contractor" for Customer H, a courier service, using the Openforce account created on March 20, 2024, with his GigSafe email address. As part of the workflow, Mr. Thompson submitted a W-9 and insurance enrollment forms. On October 15, 2024, Mr. Gerow also enrolled as a "Contractor" for Customer H, using the Openforce account created on November 8, 2023, with his personal email address. He proceeded through many steps of the enrollment process and viewed key proprietary documents related to insurance coverage, payment information, and background checks. Mr. Thompson returned to his Customer H enrollment as recently as May 5, 2025.

jimmy@withpara.com
Email address

Pickleson        David
Beneficiary Last        First Name        M.I.
Name

1800 E 13th Street, Austin, TX
Beneficiary Address

Stepchild                        or
Relationship

- *"Customer I":* On May 13, 2025, new Openforce accounts for Mr. Gerow and Ms. Hicks were created using their GigSafe email addresses. At the invite of Customer I, a courier service, both enrolled as an "Independent Contractor." Mr. Gerow, for example, proceeded through many steps of this enrollment, which allowed him to view key proprietary documents related to insurance, payments, and background checks. Like Mr. Thompson did for Customer B, Mr. Gerow completed Customer I's workflow multiple times, which allowed him to obtain more information to benefit GigSafe.

- *"Customer J":* Also on May 13, 2025, Ms. Tomkins created a new Openforce

account using her GigSafe email address. That same day, at the invite of Customer J, a freight shipping and delivery service, both Ms. Tomkins and Mr. Gerow enrolled as a "Master Contractor." Mr. Gerow also enrolled as a "Subcontractor." While doing so, he spent nearly 40 minutes proceeding through Openforce's workflows for Customer J, during which time he viewed and accessed proprietary documents related to insurance, payments, and background checks.

39. None of the GigSafe employees discussed above ever performed the courier services, retail merchandising services, supply chain management services, or other services as independent contractors for Customers A–J through Openforce's platform. Instead, on information and belief, the GigSafe employees purposefully misrepresented their identities and intentions, enrolling to improperly access, learn about, and then misuse Openforce's Trade Secrets to design a copycat competing system and provide similar offerings. This insider knowledge in the form of Openforce's pricing information also allowed GigSafe to undercut Openforce's prices, including, for example, with respect to insurance. And GigSafe advertisements for its product display a client interface starkly similar to those of Openforce's tailored and non-public administrative interfaces available only to clients with the necessary login credentials to access them.

40. Shortly after learning that GigSafe employees were improperly using and accessing its systems, Openforce terminated access to its systems for all known accounts of GigSafe personnel.

**E.** **GigSafe Builds a Competing Platform Based on the Stolen Openforce Trade Secrets, and Then Steals Openforce's Customers.**

41. On information and belief, GigSafe used the ill-gotten information from their hacking into Customer A–J's workflows in an attempt to poach them—in violation of the MNDA's customer non-solicitation provision, in which the parties agree to refrain "from any direct or indirect contact or solicitation of any customers, employees or opportunities introduced to one Party by the other Party." Ex. A, § 2.

42.    In March 2024, GigSafe, through Mr. Thompson, sent a letter to a potential Openforce customer, "Customer K," which attacked Openforce by name and said that the potential use of Openforce would likely "cost[] you a king's ransom to pay and insure your drivers." The letter lists GigSafe's mailing address as "1800 E 13th Street, Austin, TX"—the same address that Thompson listed for "David Pickleson" as the beneficiary on an occupation accident insurance form for Customer F. The letter concluded with Mr. Thompson requesting that Customer K "consider GigSafe":



43.    On information and belief, this letter to Customer K is only one example of similar letters that GigSafe sent to actual or potential Openforce's customers.

44.    On October 17, 2024, only days after both Mr. Thompson and Mr. Gerow enrolled as independent contractors with Customer H, Customer H sent Openforce a notice of cancellation on October 17, 2024. GigSafe now boasts on its website that Customer H is one of its customers.[3]

---

[3] *Our Customers*, GigSafe (last visited May 14, 2025), https://www.gigsafe.com/our-customers.

45.     On April 17, 2025, Customer B submitted to Openforce a notice of cancellation.  On information and belief, Customer B is now a customer of GigSafe.

46.     And Customer F, who appears on the GigSafe website as a GigSafe customer, recently notified Openforce that it would be cancelling its services in June.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

**Misappropriation Under and Violation of Defend Trade Secrets Act ("DTSA")**

**18 U.S.C. § 1836 *et seq.***

**Against Mr. Pickerell and GigSafe**

47.     Openforce incorporates and re-alleges each and every allegation above as if fully set forth herein.

48.     Openforce is the owner of Trade Secrets, as defined above and incorporated herein.  These Trade Secrets relate in part to Openforce's software system, including Manage, Openforce's tailored and non-public administrative interfaces available only to clients with the necessary login credentials to access them, and the Workflow Designer and related enrollment offerings, which allows companies both large and small to manage and on-board new independent contractors, as well as the finished product created for any individual customer by the Workflow Designer in the form of customers' specific enrollment workflows (blueprints); associated documents that reveal Openforce's and the customers' preferences, on-boarding processes, business operations, and compliance strategies; and information related to Openforce's insurance plans, compliance strategies, and payroll offerings.

49.     Openforce has taken reasonable and extensive measures to keep secret the Trade Secrets.  These are described above and incorporated herein and include, for example, requiring non-disclosure agreements before any external disclosures, password protecting computers, applying other network protections to prevent unauthorized external access, including firewalls, encryption, and cyber security software, requiring employees to abide by confidentiality rules and an employee code of conduct, training employees on

these rules, requiring authorization codes to enroll with its customers, and restricting use to only authorized users in connection with actually acting as an independent contractor for its customers.  Due to these security measures, the Trade Secrets are not available for others in the contractor management industry—or in any other industry—to use through any legitimate means.

50.    Openforce's Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information in the ways described above and incorporated herein.

51.    At no time did Openforce consent to GigSafe's or Mr. Pickerell's taking, using, retaining, or disclosing the Trade Secrets, except as expressly permitted under the MNDA.

52.    In violation of Openforce's rights, Mr. Pickerell and GigSafe misappropriated the Trade Secrets within the meaning of the DTSA, 18 U.S.C. § 1836, in the improper and unlawful manners as alleged above and incorporated herein, including by acquiring, retaining, and using Openforce's trade secret information.

53.    Mr. Pickerell and GigSafe misappropriated the Trade Secrets in the ways described above and incorporated here, including by (a) on information and belief, receiving Openforce's Trade Secrets and other confidential information that was wrongfully disclosed to them by GigSafe's employees masquerading as independent contractors for Openforce's customers or by pretending to be an administrator with one of Openforce's customers, (b) entering into the MNDA in order to obtain Openforce's Trade Secrets and other confidential information, despite having no intention of a potential corporate transaction with Openforce; (c) retaining those materials, and (d) using them in direct competition with Openforce.  Mr. Pickerell and GigSafe did so despite knowing that these GigSafe employees had no authorization from Openforce to possess or disclose the Trade Secrets.

54.     Mr. Pickerell's and GigSafe's ongoing misappropriation of the Trade Secrets is intentional, knowing, willful, malicious, fraudulent, and oppressive.  On information and belief, they know of the confidentiality, ownership, and use restrictions on the Trade Secrets.

55.     As a direct result of Mr. Pickerell's and GigSafe's conduct, Openforce has suffered harm and significant damages within the meaning of 18 U.S.C. § 1836(b)(3)(B)(i)(I), in an amount to be proven at trial.  In addition, Mr. Pickerell and GigSafe have been unjustly enriched as a result of his misappropriation of the Trade Secrets within the meaning of 18 U.S.C. § 1836(b)(3)(B)(i)(II), in an amount to be proven at trial.

56.     Because Openforce's remedy at law is inadequate, Openforce seeks, in addition to damages, permanent injunctive relief to recover and protect the Trade Secrets. Openforce's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

## SECOND CAUSE OF ACTION

### Misappropriation Under and Violation of the Arizona Uniform Trade Secrets Act ("AUTSA")

### Ariz. Rev. Stat. § 44-401 *et seq.*

### Against Mr. Pickerell and GigSafe

57.     Openforce incorporates and re-alleges each and every allegation above as if fully set forth herein.

58.     Openforce is the owner of Trade Secrets, as defined above and incorporated herein.  These Trade Secrets relate in part to Openforce's software system, including Manage, Openforce's tailored and non-public administrative interfaces available only to clients with the necessary login credentials to access them, and the Workflow Designer and related enrollment offerings, which allows companies both large and small to manage and on-board new independent contractors, as well as the finished product created for any individual customer by the Workflow Designer in the form of customers' specific enrollment workflows (blueprints); associated documents that reveal Openforce's

customers' preferences, on-boarding processes, business operations, and compliance strategies; and information related to Openforce's insurance plans, compliance strategies, and payroll offerings.  These Trade Secrets comprise business, scientific, technical, economic, or engineering information that constitute "trade secrets" under Arizona Rev. Stat. § 44-401(4).

59.    Openforce has taken reasonable and extensive measures to keep secret the Trade Secrets.  These are described above and incorporated herein and include, for example,  requiring non-disclosure agreements before any external disclosures, password protecting computers, applying other network protections to prevent unauthorized external access, including firewalls, encryption, and cyber security software, requiring employees to abide by confidentiality rules and an employee code of conduct, training employees on these rules, requiring authorization codes to enroll with its customers, and restricting use to only authorized users in connection with actually acting as an independent contractor for its customers.  Due to these security measures, the Trade Secrets are not available for others in the contractor management industry—or in any other industry—to use through any legitimate means.

60.    Openforce's Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information in the ways described above and incorporated herein.

61.    At no time did Openforce consent to GigSafe's or Mr. Pickerell's taking, using, retaining, or disclosing the Trade Secrets, except as expressly permitted under the MNDA.

62.    In violation of Openforce's rights, Mr. Pickerell and GigSafe misappropriated the Trade Secrets within the meaning of the AUTSA, Arizona Rev. Stat. § 44-401, in the improper and unlawful manners as alleged herein, including by acquiring, retaining, and using Openforce's trade secret information.

63.    Mr. Pickerell and GigSafe misappropriated the Trade Secrets in the ways described above and incorporated here, including by (a) on information and belief, receiving Openforce's Trade Secrets and other confidential information that was wrongfully disclosed to them by GigSafe's employees masquerading as independent contractors for Openforce's customers or by pretending to be an administrator with one of Openforce's customers, (b) entering into the MNDA in order to obtain Openforce's Trade Secrets and other confidential information, despite having no intention of a potential corporate transaction with Openforce; (c) retaining those materials, and (d) using them in direct competition with Openforce.  Mr. Pickerell and GigSafe did so despite knowing that these GigSafe employees had no authorization from Openforce to possess or disclose the Trade Secrets.

64.    Mr. Pickerell's and GigSafe's ongoing misappropriation of the Trade Secrets is intentional, knowing, willful, malicious, fraudulent, and oppressive.  On information and belief, they know of the confidentiality, ownership, and use restrictions on the Trade Secrets.

65.    As a direct result of Mr. Pickerell's and GigSafe's conduct, Openforce has suffered harm and significant damages within the meaning of Arizona Rev. Stat. § 44-403, in an amount to be proven at trial.  In addition, Mr. Pickerell and GigSafe have been unjustly enriched as a result of his misappropriation of the Trade Secrets within the meaning of Arizona Rev. Stat. § 44-403, in an amount to be proven at trial.

66.    Because Openforce's remedy at law is inadequate, Openforce seeks, in addition to damages, permanent injunctive relief to recover and protect the Trade Secrets within the meaning of Arizona Rev. Stat. § 44-402.  Openforce's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

### THIRD CAUSE OF ACTION

**Tortious Interference with Contract**

**Against Mr. Pickerell and GigSafe**

67.    Openforce incorporates and re-alleges each and every allegation above as if fully set forth herein.

68.    Openforce entered into valid and enforceable contracts with each of Customers A–J; specifically a "Business Services Agreement" with Customers A, C–G, and I; an "Openforce-Openflex Pro Business Services Agreement" with Customers B and J; and a "Third Party Administration Agreement" with Customer H.   Each of these contracts contains or contained a non-disclosure provision.

69.    On information and belief, GigSafe and Mr. Pickerell were aware of the obligations Customers A–J owed to Openforce as early as January 2024, when GigSafe and Mr. Pickerell first directed the GigSafe employees to enroll as independent contractors for any of Customers A–J to gain access to the Openforce platform.

70.    On information and belief, GigSafe and Mr. Pickerell directed GigSafe's employees to sign up or enroll on Openforce's platform as independent contractors for Customers A–J, which violated the terms of Openforce's agreements with each of Customers A–J.

71.    On information and belief, GigSafe and Mr. Pickerell directed GigSafe's employees and agents to sign up or enroll on Openforce's platform as independent contractors for Customers A–J for the purposes of learning Openforce's workflows as to each of Customers A–J, attempting to recreate competing workflows, and taking the business of Customers A–J from Openforce.

72.    On information and belief, GigSafe and Mr. Pickerell used the Trade Secrets and confidential information acquired by GigSafe's employees to create a product that competes with Openforce.   At least three of Customers A–J have left or will leave Openforce, and GigSafe lists two of Customers A–J as customers on its website.

73. Openforce has suffered actual damages as a result of GigSafe's and Mr. Pickerell's interference and will continue to suffer absent declaratory and injunctive relief, substantial pecuniary loss in an amount to be determined at trial and irreparable harm to Openforce's business.

74. On information and belief, GigSafe and Mr. Pickerell directed the GigSafe employees to sign up as independent contractors on Openforce's platform and to gain access through misrepresentation about being a potential independent contractor.  And the GigSafe employees did so within the scope of their employment for GigSafe, as shown by, among other things, the GigSafe employees (a) using GigSafe and Para email addresses; (b) listing Mr. Pickerell as a beneficiary on several forms; (c) identifying Mr. Pickerell as the "boss," "El Jefe," or a "coworker" on several forms; and (d) listing Para as the GigSafe employee's employer.

## FOURTH CAUSE OF ACTION

### Tortious Interference with Business Expectancy

### Against Mr. Pickerell and GigSafe

75. Openforce incorporates and re-alleges each and every allegation above as if fully set forth herein.

76. Openforce has entered into a valid, enforceable contract with each of Customers A–J of an ongoing nature, as described above and incorporated here, which are each subject to a 30-day notice to terminate.  Each of the customers had been with Openforce for multiple years, and Openforce reasonably expected those business relationships to continue.

77. On information and belief, GigSafe and Mr. Pickerell were aware of the relationship between Openforce and Customers A–J as early as January 2024, when GigSafe and Mr. Pickerell, on information and belief, first directed GigSafe's employees to enroll as independent contractors with Customers A–J using the Openforce platform.

78. On information and belief, GigSafe and Mr. Pickerell directed GigSafe's employees and agents to sign up or enroll on Openforce's platform as independent

contractors for Customers A–J for the purposes of learning Openforce's workflows as to each of Customers A–J, attempting to recreate competing workflows, and taking the business of Customers A–J from Openforce.

79.    On information and belief, GigSafe and Mr. Pickerell used the information acquired by GigSafe's employees to create a product that competes with Openforce.  At least three of Customers A–J have left or will leave Openforce, and two of Customers A–J are listed as customers on GigSafe's website.

80.    Openforce has suffered actual damages as a result of GigSafe's and Mr. Pickerell's interference, and will continue to suffer absent declaratory and injunctive relief, substantial pecuniary loss in an amount to be determined at trial and irreparable harm to Openforce's business.

81.    On information and belief, GigSafe and Mr. Pickerell directed the GigSafe employees to sign up as independent contractors on Openforce's platform and to gain access through misrepresentation about being a potential independent contractor.  And the GigSafe employees did so within the scope of their employment for GigSafe, as shown by, among other things the GigSafe employees (a) using GigSafe and Para email addresses; (b) listing Mr. Pickerell as a beneficiary on several forms; (c) identifying Mr. Pickerell as the "boss," "El Jefe," or a "coworker" on several forms; and (d) listing Para as the GigSafe employee's employer.

### FIFTH CAUSE OF ACTION

**Fraudulent Misrepresentation**

**Against GigSafe**

82.    Openforce incorporates and re-alleges each and every allegation above as if fully set forth herein.

83.    On information and belief, at the direction of GigSafe and Mr. Pickerell and within the scope of their employment at GigSafe, Mr. Thompson, Mr. Gerow, Mr. Kochetkov, Ms. DiGulio, Ms. Tomkins, and Ms. Hicks in each of the enrollments on

each of the dates identified above, represented that each would serve as independent contractors for certain of Openforce's clients.

84.    On information and belief, this representation was false; they never had any intention of serving as independent contractors, including because at the time of the representation, they were employees or agents of GigSafe.  None of Mr. Thompson, Mr. Gerow, Mr. Kochetkov, Ms. DiGulio, Ms. Tomkins, and Ms. Hicks ever worked for Openforce's customers as independent contractors as a result of enrollments in Openforce's system.

85.    These representations were material because access to Openforce's proprietary enrollment platform is conditioned on the individuals' representation that they are using the system for the purposes of serving as an independent contractor.

86.    On information and belief, Mr. Thompson, Mr. Gerow, Mr. Kochetkov, Ms. DiGulio, Ms. Tomkins, and Ms. Hicks knew their representations were false, because they made the representations while employees at GigSafe and never intended to work for Openforce's customers as independent contractors.

87.    On information and belief, Mr. Thompson, Mr. Gerow, Mr. Kochetkov, Ms. DiGulio, Ms. Tomkins, and Ms. Hicks intended that Openforce would rely upon their representations, so that they would gain access to the Openforce system.

88.    Openforce was unaware at the time that the representations of Mr. Thompson, Mr. Gerow, Mr. Kochetkov, Ms. DiGulio, Ms. Tomkins, and Ms. Hicks were false.  Openforce processes thousands of independent contractors through its system, and to do so, has implemented a reasonable system of checks to ensure the person is who they say they are and to rely on representations provided by the enrolling independent contractor, especially because it is ultimately the decision of the Openforce client to decide whether to accept the enrollment.

89.    As a direct result of GigSafe's conduct, Openforce has suffered injury.  On information and belief, GigSafe and Mr. Pickerell used the information acquired by GigSafe's employees through fraud to create a product that competes with Openforce.  At

least three of Customers A–J have left or will leave Openforce, and two of Customers A–J are listed as customers on GigSafe's website.

### SIXTH CAUSE OF ACTION

**Fraudulent Inducement of a Contract**

**Against Mr. Pickerell and GigSafe**

90.     Openforce incorporates and re-alleges each and every allegation above as if fully set forth herein.

91.     As described above and incorporated here, Openforce entered into a valid and enforceable contract with Para—the MNDA—to enable the exchange of information between the two parties to evaluate a potential corporate transaction between them.

92.     On information and belief, Mr. Pickerell and Para misrepresented to Openforce that it was interested in a potential corporate transaction.  On information and belief, this representation was false, because at the same time of the MNDA, Mr. Pickerell and Para had started GigSafe, which is a direct competitor to Openforce.  On information and belief, Mr. Pickerell and Para intentionally hid the existence of GigSafe from Openforce.

93.     This misrepresentation was material because Openforce would have had no interest in discussing its confidential information with Mr. Pickerell and Para absent the possibility of the contemplated commercial transaction and had it known that Mr. Pickerell and Para had no intention of entering into that transaction.

94.     On information and belief, Mr. Pickerell and Para made this misrepresentation with knowledge of its falsity because Para had started GigSafe, a direct competitor to Openforce, at the same time as the MNDA was executed.

95.     On information and belief, Mr. Pickerell and Para made this misrepresentation about its intentions of competing against Openforce and misusing its confidential information with the intent of inducing Openforce to enter into the MNDA, which was a necessary condition for the Openforce to share sensitive, proprietary information with Mr. Pickerell and Para about Openforce's business.

96.     Openforce reasonably relied on Mr. Pickerell's and Para's misrepresentation because GigSafe was not a publicly known entity at the time, and Mr. Pickerell and Para affirmatively hid from Openforce their intent to compete against Openforce through their new GigSafe venture.

97.     at no point in the prior discussions between Openforce and Para had Para or Mr. Pickerell ever suggested that they intended to open a direct competitor to Openforce.

98.     As a direct and proximate result of Para's and Mr. Pickerell's misconduct, Openforce has been directly harmed in an amount to be proven at trial, including because it induced Openforce into sharing sensitive business information with Para and Mr. Pickerell that it otherwise would not have, Para and Mr. Pickerell then used this information to launch a competing product, GigSafe, and GigSafe has stolen customers from Openforce.

## SEVENTH CAUSE OF ACTION

### Breach of Contract (Openforce-Para Mutual Non-Disclosure Agreement)

### Against GigSafe

99.     Openforce incorporates and re-alleges each and every allegation above as if fully set forth herein.

100.     As described above and incorporated here, Openforce entered into a valid and enforceable contract with Para—the MNDA—to enable the exchange of information between the two parties to evaluate potential corporate transaction between them.

101.     GigSafe is a d/b/a of Para, so the MNDA applies with equal force to GigSafe. Further, the MNDA contains a valid successor clause binding Para's "successors," which covers GigSafe in the event discovery reveals that GigSafe is technically organized as a separate corporate entity because, at minimum, GigSafe is a "successor" to Para.

102.     GigSafe breached the MNDA's provision barring "any direct or indirect contact or solicitation of any customers . . . introduced to one Party by the other Party." Ex. A, § 2.   On information and belief, GigSafe has engaged in many affirmative solicitations of such customers.

103.    On information and belief, GigSafe breached the MNDA by, among other things, using Openforce's Trade Secrets and Confidential Information (as that term is defined in the MNDA) in a manner not for the benefit of Openforce.  Ex. A, § 1(a)-(b).

104.    On information and belief, GigSafe further breached the MNDA by failing to return Openforce's Trade Secrets and Confidential Information (as that term is defined in the MNDA) in compliance with section 1(d).  Ex. A, § 1(d).

105.    Openforce has performed all of its obligations under the MNDA.

106.    As a direct and proximate result of GigSafe's breach of the MNDA, Openforce has been directly harmed in an amount to be proven at trial.

107.    As provided in the MNDA, GigSafe agreed that its breach of the MNDA meant that Openforce cannot be made whole by monetary damages, and therefore, Openforce seeks an injunction to prevent a breach or further breach of the MNDA.  Ex. A, § 4.

108.    Further, for GigSafe's breach of the MNDA, Openforce is entitled to reasonable attorney's fees incurred in seeking to enforce the MNDA.  *Id.*

### EIGHTH CAUSE OF ACTION

**Unfair Competition**

**Against Mr. Pickerell and GigSafe**

109.    Openforce incorporates and re-alleges each and every allegation above as if fully set forth herein.

110.    Openforce owns confidential information, as discussed above and incorporated herein.  Openforce maintains that this information qualifies as trade secrets as defined above and under both the DTSA and the AUTSA.  But to the extent that this information is determined to not qualify as a trade secret, Openforce maintains that this information qualifies as confidential, including because Openforce has taken appropriate measures to keep this information secret.  These include, for example, requiring non-disclosure agreements before any external disclosures, password protecting computers, applying other network protections to prevent unauthorized external access, including

firewalls, encryption, and cyber security software, requiring employees to abide by confidentiality rules and an employee code of conduct, training employees on these rules, requiring authorization codes to enroll with its customers, and restricting use to only authorized users in connection with actually acting as an independent contractor for its customers.

111.    At no time did Openforce consent to Mr. Pickerell's taking, using, retaining, or disclosing Openforce's confidential information for any purpose except for the benefit of Openforce.  At no time did Openforce consent to GigSafe's or its employees' taking, using, retaining, or disclosing Openforce's confidential information for any purpose at all.

112.    In violation of Openforce's rights, Mr. Pickerell and GigSafe improperly accessed and misused Openforce's confidential information, in the improper and unlawful manners as alleged herein, including by improperly acquiring, retaining, and using Openforce's confidential information.

113.    Mr. Pickerell and GigSafe improperly accessed and misused Openforce's confidential information in the ways described above and incorporated here, including by (a) on information and belief, receiving Openforce's confidential information that was wrongfully disclosed to them by GigSafe's employees masquerading as independent contractors for Openforce's customers, (b) entering into the MNDA in order to obtain Openforce's Trade Secrets and other confidential information, despite having no intention of a potential corporate transaction with Openforce; (c) retaining those materials, and (d) using them in direct competition with Openforce.  Mr. Pickerell and GigSafe did so despite knowing that these GigSafe employees had no authorization from Openforce to possess or disclose Openforce's confidential information.

114.    Mr. Pickerell's and GigSafe's ongoing misuse of Openforce's confidential information is intentional, knowing, willful, malicious, fraudulent, and oppressive.  They know of the confidentiality, ownership, and use restrictions on Openforce's confidential information.

115.   As a direct result of Mr. Pickerell's and GigSafe's conduct, Openforce has suffered harm and significant damages in an amount to be proven at trial.

### NINTH CAUSE OF ACTION

**Unjust Enrichment**

**Against Mr. Pickerell and GigSafe**

116.   Openforce incorporates and re-alleges each and every allegation above as if fully set forth herein.

117.   Openforce owns Trade Secrets, as defined above and incorporated herein.  In violation of Openforce's rights, Mr. Pickerell and GigSafe misappropriated the Trade Secrets in the improper and unlawful manners as alleged herein, including by acquiring, retaining, and using Openforce's trade secret information.  On information and belief, Mr. Pickerell and GigSafe used the Trade Secrets in the ways described above and incorporated here, including by using them to create a contractor-management platform in direct competition with Openforce.  Mr. Pickerell and GigSafe have economically benefited from their use of Openforce's Trade Secrets by gaining customers for their competing platform and have been unjustly enriched to Openforce's detriment, including because Openforce has lost customers to GigSafe.

118.   At no time did Openforce consent to GigSafe's or Mr. Pickerell's using the Trade Secrets in the ways described herein, which were likewise without justification.

119.   It would be inequitable and unjust to allow Defendants to retain the economic benefits conferred upon them by stealing Openforce's Trade Secrets for use in their competing product.

120.   Openforce has no adequate remedy at law.

121.   As a result of Defendants' wrongful conduct, Openforce is entitled to the preliminary and permanent injunctive relief requested herein and damages in an amount to be proven at trial.

122.   Openforce further seeks an order establishing Defendants as constructive trustees of any profits by which they are unjustly enriched, together with interest during

the period when Defendants retain such funds, and requiring Defendants to disgorge those funds to Openforce.

123.   At all material times, the GigSafe employees were acting as employees of GigSafe, and Defendants are therefore liable for the harm and damages caused by the GigSafe employees' unlawful conduct.

## DEMAND FOR JURY TRIAL

124.   Openforce demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

Openforce prays for a judgment against GigSafe as follows:

a.     A judgment in favor of Openforce and against GigSafe and Mr. Pickerell;

b.     An award of damages caused by GigSafe's and Mr. Pickerell's conduct, including compensatory, unjust enrichment, punitive, and exemplary damages, as well as applicable interest;

c.     The disgorgement of GigSafe's and Mr. Pickerell's profits, proceeds, and financial gain associated with the wrongdoing alleged herein;

d.     Preliminary and permanent injunctions enjoining GigSafe and Mr. Pickerell, as well as their employers, agents, employees, and all persons acting in concert with them, from using, copying, publishing, disclosing, transferring, or selling Openforce's Trade Secrets or other confidential or proprietary information, or any product that is based on or incorporates part or all of Openforce's Trade Secrets or other confidential and proprietary information, and from obtaining any commercial advantage or unjust enrichment from their misappropriation of Openforce's Trade Secrets or other confidential or proprietary information;

e.     An injunction requiring GigSafe to comply with all terms of the MNDA, including by: (i) holding Openforce's Trade Secrets and Confidential Information in the strictest confidence and not using them for any unauthorized purpose; (ii) delivering to Openforce all of its property in any form; (iii) refraining from competing with Openforce for a period of six months following the termination of the MNDA, plus an additional

amount of time corresponding to the amount of time that GigSafe competed with Openforce and that it took Openforce to obtain a favorable judgment; and (iv) not soliciting Openforce's customers in accordance with the terms of the MNDA;

f.      A declaration that neither GigSafe nor Mr. Pickerell have any rights or privileges to use Openforce's Trade Secrets;

g.      A declaration stating that the original three-year term of the non-compete provision of the MNDA, Ex. A § 3, shall be extended by one day for each day GigSafe failed to comply with it;

h.      An order requiring GigSafe and Mr. Pickerell, as well as their employers, agents, employees, and all persons acting in concert with them, to return to Openforce any and all of Openforce's Trade Secrets or other confidential or proprietary information that may be determined not to be Trade Secret information, including but not limited to any and all materials created incorporating or referencing Openforce's Trade Secrets or other confidential information;

i.      The imposition of a constructive trust for the benefit of Openforce upon: (i) all assets misappropriated or used by GigSafe in violation of its contractual obligations to Openforce, and all Openforce trade secrets misappropriated by GigSafe and/or Mr. Pickerell; and (ii) all gains, including, but not limited to, any profits of, equity interests in, and/or increases in the value of equity interests in, GigSafe, derived from the breach of any agreements with Openforce, or from any misappropriation of Openforce's Trade Secrets or other confidential or proprietary information by GigSafe and/or Mr. Pickerell;

j.      An award of its reasonable attorney's fees costs, and expenses incurred pursuant to the MNDA, A.R.S. §§ 12-341.01, 12-341, and any other applicable agreements and law;

k.      All pre-judgment and post-judgment interest as permitted under the parties' agreements and the law; and

l.      Such other relief as the Court may deem proper.

1

2

3   Dated:  May 14, 2025                    By: *s/ Cameron A. Fine*
                                               _____

4                                              **O'MELVENY & MYERS LLP**

5                                              David S. Almeling (*pro hac vice* application
                                               forthcoming)

6                                              dalmeling@omm.com
                                               Christopher B. Phillips (*pro hac vice*

7                                              forthcoming)
                                               cphillips@omm.com

8                                              Two Embarcadero Center, 28th Floor

9                                              San Francisco, California 94111-3823
                                               Telephone: (415) 984-8700

10                                             Facsimile: (415) 984-8701

11
                                               Patrick V. Plassio (*pro hac vice* application

12                                             forthcoming)
                                               pplassio@omm.com

13                                             2801 North Harwood Street, Suite 1600

14                                             Dallas, Texas 75201-2692
                                               Telephone: (972) 360-1900

15                                             Facsimile: (972) 360-1901

16
                                               **DLA PIPER LLP (US)**

17                                             Cameron A. Fine
                                               cameron.fine@us.dlapiper.com

18                                             Madeline A. Cordray

19                                             madeline.cordray@us.dlapiper.com
                                               2525 East Camelback Road, Suite 1000

20                                             Phoenix, Arizona 85016
                                               Telephone: (480) 606-5100

21                                             Facsimile: (480) 606-5101

22
                                               *Attorneys for Plaintiff*

23                                             *Contractor Management Services, LLC d/b/a*
                                               *Openforce*

24

25

26

27

28