**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Contractor Management Services LLC, | No. CV-25-01645-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Para Incorporated, et al., | |
| Defendants. | |
| Para Incorporated, | |
| Counter Claimant, | |
| v. | |
| Contractor Management Services LLC, | |
| Counter Defendant. | |

This is a lawsuit between two "direct competitors," Contractor Management Services LLC d/b/a Openforce ("Openforce") and Para Incorporated d/b/a GigSafe ("GigSafe"), in the contractor management software industry. (Doc. 37 at 3 ¶ 3.)

Openforce's initial complaint included a claim against GigSafe for fraudulent misrepresentation (Doc. 1 ¶¶ 82-89), which the Court dismissed with leave to amend (Doc. 35). In Count Four of its operative pleading, the First Amended Complaint ("FAC"), Openforce reasserts a fraudulent misrepresentation claim against GigSafe (Doc. 37 at 31-33 ¶¶ 77-85) and GigSafe has again moved to dismiss (Doc. 48). For the reasons that follow, the motion is denied.

**BACKGROUND**

I.    <u>Relevant Factual Allegations</u>

The factual allegations in the FAC remain largely unchanged from the original complaint. (Doc. 36-1 [redline of changes from original complaint to FAC].)  Because those factual allegations are recounted in detail in the order addressing the first motion to dismiss, it is unnecessary to summarize them here.  The following facts, presumed true, are derived from the FAC (Doc. 37) and relate specifically to Openforce's claim for fraudulent misrepresentation.

A.    **General Allegations of Fraudulent Representations**

"Since November 2023, and continuing to this day, GigSafe's personnel have lied about their identities and intentions to access Openforce's software system, which has allowed Defendants[1] to misappropriate more of Openforce's proprietary, customer-specific enrollment and workflow information, insurance offerings, payment plans, system mechanics, and client admin interface designs.  Openforce's internal logs reflect that at least six different GigSafe employees on over 20 separate occasions improperly accessed Openforce's platform by misrepresenting themselves as would-be independent contractor drivers for at least ten Openforce clients." (*Id.* at 3 ¶ 4.)  "GigSafe's employees spent days iteratively 'enrolling' and/or 'onboarding' through Openforce's workflows." (*Id.* at 3 ¶ 5.) "Openforce has to date uncovered Defendants' scheme involving ten of its customers," which are identified in the FAC by pseudonyms as "Customers A-J." (*Id.*)  The FAC alleges that Defendants and their employees "misrepresent[ed] their true intentions and identities to access the systems of Openforce." (*Id.* at 6 ¶ 12.)

B.    **Customer-Specific Workflows And Contractor Management Platform**

In its software deployment process, Openforce develops with its clients a workflow 'blueprint' and offers each of its clients a customizable Workflow Designer.  This proprietary software tool allows companies to tailor their processes for onboarding (or 'enrolling') new independent contractors.  These processes involve customized

---

[1]    "Defendants" are GigSafe and its CEO, David Pickerell ("Pickerell").

- 2 -

'workflows' appearing on each company's protected Openforce portal . . . ." (*Id.* at 7 ¶ 14.) "These workflows and the materials contained in them (often called a blueprint) are a critical component of Openforce's offerings." (*Id.*)

"These bespoke customer workflows go hand-in-hand with Openforce's Contractor Management Platform, Manage (formerly IC Manage). Through Manage, Openforce's customers can streamline key aspects of their relationship with their independent contractors in ways that Openforce has fine-tuned over decades. Manage allows Openforce clients to supplement their conventional recruiting methods by accessing Openforce's database of proven independent contractors. It empowers them to onboard independent contractors through the bespoke workflows discussed above." (*Id.* at 7 ¶ 15.)

"Openforce uses a unique, customer-specific activation code that Openforce provides to each of its customers to restrict the ability of a real independent contractor to access these steps and enroll to work as an independent contractor for one of Openforce's customers, to view and negotiate agreements, to enroll in insurance products, to document business decisions, to view customer onboarding requirements, to complete identity verifications and background checks, and to do business with Openforce customers." (*Id.* at 11-12 ¶ 22.)

C.    **The Initial Alleged Hacking**

"Defendants put their plan into action in June 2022 when Para employee Jimmy Thompson created an Openforce account posing as an independent contractor . . . with the intention of infiltrating Openforce's system, so that they could learn how Openforce operates and create a competing company." (*Id.* at 13 ¶ 24.) "The plan did not get far at first, thanks to Openforce's structure and security." (*Id.* at 13 ¶ 25.) Specifically, "Openforce . . . limit[s] access to the enrollment platform to those with a customer-specific activation code. When entered, an activation code allows an independent contractor to access the enrollment workflow for the specific customer who provided that code." (*Id.*) "Use of these codes and access to these systems is authorized only by actual independent contractors seeking work with Openforce's customers. Using activation codes to access

the particularized workflows of any customers for any other purpose—such as to misappropriate Openforce's Trade Secrets—is forbidden by an end user license agreement, to which all would-be contractors must agree before accessing Openforce's system to begin on-boarding." (*Id.*)  Ater the first plan failed, Defendants "devised a scheme to  . . obtain[] Openforce's activation codes and then [lie] about their true intentions for using them." (*Id.*)

### D.   The Second Phase Of Alleged Hacking And Misrepresentations

"[T]he next step in [Defendants'] scheme" was to have "GigSafe employees create[] accounts with Openforce by masquerading as independent contractor drivers seeking work from Openforce's clients—just as they had attempted with Mr. Thompson in June of 2022." (*Id.* at 16 ¶ 36.)  "But this time was different," because Defendants now "knew how to get these employees 'inside' Openforce's systems by posing as independent contractors and procuring customer-specific activation codes.  Once inside, the GigSafe actors could access Openforce's Trade Secrets in the form of customer-specific workflows and, by implication, the underlying Workflow Designer that Openforce uses to build them." (*Id.*)  The FAC alleges that "[o]ver the next year and a half . . . GigSafe and Mr. Pickerell misused the activation codes for at least ten Openforce customers." (*Id.*)

"On November 8, 2023, GigSafe employee Daniel Gerow, responsible for GigSafe's compliance and insurance, created an account in furtherance of this plan.  On January 16, 2024, three additional GigSafe employees—Ms. DiGulio, Mr. Thompson, and Valery Kochetkov (GigSafe's Director of Engineering)—did the same.  And on May 13, 2025, two additional GigSafe employees created accounts in furtherance of this plan—Amanda Tomkins (Product & Customer Success) and Megan Hicks (Client Manager).  All six GigSafe employees did so by posing as independent contractors." (*Id.* at 16 ¶ 37.) "GigSafe—through Mr. Thompson, Mr. Gerow, Ms. DiGulio, Mr. Kochetkov, Ms. Tomkins, and Ms. Hicks—then took the next step in their plan, entering customer activation codes and going through the enrollment process and accessing the Openforce systems" for Customers A-J.  (*Id.* at 16 ¶ 38.)

…

### 1.    Customer A

"On January 16, 2024, Mr. Kochetkov became the first known GigSafe employee to enroll with an Openforce client.  He did so by pretending to be an independent contractor 'Delivery Partner' for an Openforce client, Customer A, a same-day delivery company for construction parts.  Doing so granted him access to Customer A's custom designed enrollment workflows on the Openforce platform." (*Id.* at 17 ¶ 38.)

"On January 23, 2024, Mr. Thompson followed suit, enrolling as a 'Delivery Partner.'" (*Id.*)

"On February 9, 2024, DiGulio did the same." (*Id.*)

"Nearly one year later, Mr. Thompson again enrolled as a 'Delivery Partner' for Customer A, this time using the Openforce account he had created on June 21, 2022, with his Para email address." (*Id.*)  "As part of this process, Mr. Thompson signed an independent contractor agreement with Company A, misrepresenting that he would be performing services for Customer A." (*Id.*) "Mr. Thompson in an insurance coverage form identified Mr. Pickerell—his 'Work Colleague'—as the policy's beneficiary." (*Id.*)

### 2.    Customer B

"On February 6, 2024, Mr. Thompson returned to Openforce's platform, where he enrolled as a 'Contractor' for another Openforce client, Customer B, a same-day courier service.  This time, Mr. Thompson used the Openforce account he created in June 2022 with a Para email address." (*Id.* at 18 ¶ 38.)  And Mr. Thompson "again signed a document misrepresenting that he operated his own 'independent business' and that he was 'providing service for or in connection with' Company B 'as an independent contractor.'" (*Id.*)  "As with Customer A, Mr. Thompson also filled out an insurance form identifying Mr. Pickerell—referred to this time as 'El Jefe'—as the beneficiary." (*Id.*)

### 3.    Customer C

"On March 7, 2024, Mr. Thompson enrolled twice as a 'Motor Carrier' for Customer C, a supply chain management firm, using two different accounts associated with

a Para email address." (*Id.*) "Mr. Thompson specifically identified 'Para Inc.' as his employer and the entity that would contract with Customer C." (*Id.* at 18-19 ¶ 38.) "Mr. Thompson repeatedly returned to the enrollment system in the following months—he has done so as recently as April 28, 2025." (*Id.* at 19 ¶ 38.)

### 4.    Customer D

"In early April 2024, Mr. Thompson used an Openforce account that he created with his GigSafe email a few weeks prior to fraudulently enroll as a 'Field Representative' for Customer D, a retail intelligence and merchandising service company." (*Id.*) "Mr. Thompson again signed up for insurance as an 'Independent Contractor' for Customer D. As usual, Mr. Thompson listed Mr. Pickerell as the beneficiary on this form . . . identif[ying] Mr. Pickerell as his 'Boss' . . . ." (*Id.*)

### 5.    Customer E

"On April 12, 2024, Mr. Thompson created another new Openforce account, this time with a Para email address. That day, Mr. Thompson used the Openforce account he created on January 16, 2024, with a personal email address to enroll as an 'Independent Contractor – Courier' for Customer E, a same-day courier service." (*Id.*)

"On April 15, 2024, Mr. Thompson created another Openforce account with a different GigSafe email address. He used this account to enroll for a second time as an 'Independent Contractor – Courier' for Customer E. That day, he used his Openforce account created on April 12, 2024, with a Para email address to enroll as an 'Independent Contractor – Courier' for Customer E for a third time." (*Id.* at 19-20 ¶ 38.)

### 6.    Customer F

"On April 16, 2024, Mr. Thompson enrolled as a 'New Contractor (CBC & DS)' for Customer F, a medical courier service, using the Openforce account he created on April 12, 2024, with a Para email address. Just over one week later, on April 25, 2024, he enrolled as a 'New Contractor' for Customer F, using the Openforce account created on March 20, 2024, with his GigSafe email address. And on April 26, 2024, he enrolled again as a 'New Contractor' for Customer F, using an Openforce account he created on June 21,

2022, with a Para email address." (*Id.* at 20 ¶ 38.) "[D]uring this final process," Mr. Thompson "filled out a W-9 form on behalf of 'Para Inc.' listing a San Francisco address associated with Para and Mr. Pickerell. He filled out an auto insurance form again listing this San Francisco address. He once again listed this San Francisco address in an occupation accident insurance form, in which he identified" a "David Pickelson [sic]" as his "Stepchild" and "beneficiary." (*Id.*) "Mr. Thompson also filled out a 'Logistics-Carrier Agreement' between Customer F and 'Para Inc.,' listing again the San Francisco address associated with Para and Mr. Pickerell." (*Id.*)

"Around this same time, on April 24, 2024, a separate GigSafe employee, Mr. Gerow, also enrolled as a 'New Contractor' for Customer F, using the Openforce account he created on November 8, 2023." (*Id.*)

"Finally, on June 28, 2024, Mr. Thompson enrolled for a third time as a 'New Contractor' for Customer F, using an Openforce account he created on June 21, 2022, with a Para email address." (*Id.*)

### 7.    Customer G

"On August 21, 2024, Mr. Gerow enrolled as a 'Direct IC Owner Operator' for Customer G, a courier service." (*Id.*) Mr. Gerow "fill[ed] out and view[ed] insurance enrollment forms and agreements with Customer G." (*Id.* at 21 ¶ 38.)

### 8.    Customer H

"On October 13, 2024, Mr. Thompson enrolled as a 'Contractor' for Customer H, a courier service, using the Openforce account created on March 20, 2024, with his GigSafe email address. As part of the workflow, Mr. Thompson submitted a W-9 and insurance enrollment forms." (*Id.*)

"On October 15, 2024, Mr. Gerow also enrolled as a 'Contractor' for Customer H, using the Openforce account created on November 8, 2023, with his personal email address. . . . Mr. Thomson returned to his Customer H enrollment as recently as May 5, 2025." (*Id.*)

…

9.    Customer I

"On May 13, 2025, new Openforce accounts for Mr. Gerow and Ms. Hicks were created using their GigSafe email addresses.  At the invite of Customer I, a courier service, both enrolled as an 'Independent Contractor.'"  (*Id.*)

10.    Customer J

"Also on May 13, 2025, Ms. Tomkins created a new Openforce account using her GigSafe email address.  That same day, at the invite of Customer J, a freight shipping and delivery service, both Ms. Tomkins and Mr. Gerow enrolled as a 'Master Contractor.'  Mr. Gerow also enrolled as a 'Subcontractor.'"  (*Id.* at 21-22 ¶ 38.)

E.    **Falsity And Remaining Allegations**

"None of the GigSafe employees discussed above ever performed the courier services, retail merchandising services, supply chain management services, or other services as independent contractors for Customers A-J through Openforce's platform. Instead, on information and belief, the GigSafe employees purposefully misrepresented their identities and intentions, enrolling to improperly access, learn about, and then misuse Openforce's Trade Secrets to design a copycat competing system and provide similar offerings."  (*Id.* at 22 ¶ 39.)

"[A]t the direction of GigSafe and Mr. Pickerell and within the scope of their employment at GigSafe, Mr. Thompson, Mr. Gerow, Mr. Kochetkov, Ms. DiGulio, Ms. Tomkins, and Ms. Hicks in each of the enrollments on each of the dates identified above, represented that each would serve as independent contractors for certain of Openforce's clients."  (*Id.* at 31 ¶ 78.)  "[T]his representation was false; they never had any intention of serving as independent contractors, including because at the time of the representation, they were employees or agents of GigSafe and they made these misrepresentations to benefit GigSafe instead of intending to enroll as independent contractors.  None of Mr. Thompson, Mr. Gerow, Mr. Kochetkov, Ms. DiGulio, Ms. Tomkins, and Ms. Hicks ever worked for Openforce's customers as independent contractors as a result of enrollments in Openforce's system . . . ."  (*Id.* at 31 ¶ 79.)  "These representations were material because

access to Openforce's proprietary enrollment platform is conditioned on the individuals' representation that they are using the system for the purposes of serving as an independent contractor." (*Id.* at 31 ¶ 80.)

The six GigSafe employees "knew their representations were false, because they made the representations while employees at GigSafe and never intended to work for Openforce's customers as independent contractors" and they "intended that Openforce would rely upon their representations, so that they would gain access to the Openforce system." (*Id.* at 31-32 ¶¶ 81-82.)

"Openforce was unaware at the time that the representations of [the six GigSafe employees] were false. Openforce processes thousands of independent contractors through its system, and to do so, has implemented a reasonable system of checks to ensure the person is who they say they are and to rely on representations provided by the enrolling contractor, especially because it is ultimately the decision of the Openforce client to decide whether to accept the enrollment." (*Id.* at 32 ¶ 83.)

II.    Relevant Procedural Background

On May 14, 2025, Openforce initiated this action. (Doc. 1.)

On June 30, 2025, Defendants filed a pair of motions to dismiss the complaint. (Docs. 12, 13.) On January 30, 2026, after those motions became fully briefed (Docs. 15, 16, 25, 26), the Court granted them in part and denied them in part (Doc. 35). Among other things, the Court concluded that Openforce's fraudulent misrepresentation claim against GigSafe, as pleaded, was preempted by the Arizona Uniform Trade Secrets Act ("AUTSA") and therefore declined to reach GigSafe's alternative dismissal arguments premised on Openforce's purported failure to satisfy Rule 9(b). (*Id.* at 43, 47, 52.)

On February 13, 2026, Openforce filed the FAC. (Doc. 37.) The FAC asserts six claims against Pickerell and/or GigSafe: (1) misappropriation in violation of the Defend Trade Secrets Act ("DTSA") (Doc. 37 at 24-26 ¶¶ 47-56); (2) misappropriation in violation of the AUTSA (*id.* at 26-28 ¶¶ 57-66); (3) tortious interference with contract (*id.* at 29-31 ¶¶ 67-76); (4) fraudulent misrepresentation (*id.* at 31-33 ¶¶ 77-85); (5) breach of contract

(*id.* at 33-34 ¶¶ 86-95); and (6) unfair competition (*id.* at 34-35 ¶¶ 96-102).

On March 6, 2026, Defendants answered the complaint, and GigSafe asserted several counterclaims against Openforce. (Doc. 49. *See also* Doc. 61 [amended counterclaims].)[2] That same day, GigSafe moved to dismiss the FAC's fraudulent misrepresentation claim pursuant to Rules 12(b)(6) and 9(b). (Doc. 48.) The motion is now fully briefed (Docs. 53, 54) and neither side requested oral argument.

**DISCUSSION**

I.    Legal Standard

Under Rule 12(b)(6), "to survive a motion to dismiss, a party must allege sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (cleaned up). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "[A]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party." *Id.* at 1144-45 (citation omitted). However, the Court need not accept legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 678-80. Moreover, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. The court also may dismiss due to "a lack of a cognizable legal theory." *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

Both sides agree that Openforce's fraudulent misrepresentation claim is subject to the heightened pleading requirements of Rule 9(b). (Docs. 48, 53, 54 [all applying Rule 9(b)].) Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "To satisfy Rule 9(b), a pleading must identify 'the who, what, when, where, and how of the misconduct charged,' as well as what

---

[2] On May 15, 2026, Openforce moved to dismiss GigSafe's counterclaims. (Doc. 63.) The Court is aware of this motion and will rule on it in due course.

is false or misleading about the purportedly fraudulent statement, and why it is false." *United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (cleaned up). *See also Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986) ("We have interpreted Rule 9(b) to mean that the pleader must state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation."). "The circumstances constituting the alleged fraud [must] be specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (cleaned up).

II.    The Parties' Arguments

GigSafe argues that "Openforce has now had two bites at the apple to plead its fraudulent misrepresentation claim with the required specificity." (Doc. 48 at 1.) GigSafe notes that it initially "sought to dismiss the Original Complaint's fraudulent misrepresentation claim" both for failure to satisfy Rule 9(b) and as preempted by the AUTSA, but "[t]he Court agreed with the latter and did not reach the former, in deciding GigSafe's Motion to Dismiss." (*Id.*) GigSafe argues that, in the FAC, "Openforce's new allegations take aim only at circumventing AUTSA preemption" and that "[w]hat remains missing from the [FAC] are allegations supporting several critical components of a fraud claim—namely, the 'what,' the 'who,' and the 'where' of the alleged misrepresentations." (*Id.* at 1-2.) As for the "what" requirement, GigSafe argues that the FAC, like the complaint, "is littered with screenshots purporting to show GigSafe employees signing documents as part of the customer enrollment process" but that "the screenshots fail to show (and Openforce fails to otherwise allege) the 'specific content of the false representations.'" (*Id.* at 3, quoting *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007).) GigSafe argues that "[a]t best, Paragraph 38 (which remains substantively unchanged) provides only vague, summary overviews of the enrollment paperwork with fleeting references to 'misrepresentations' made as to two customers (Customers A and B).

And Paragraph 78, while pleading that certain employees 'represented that each would serve as independent contractors for certain of Openforce's clients,' points back to the 'enrollments . . . identified above,' presumably referring to the enrollments outlined in Paragraph 38 that contain no allegations or images of the contents of misrepresentations." (*Id.*)  GigSafe argues that, "[i]n any event, that employees 'represented that [they] would serve as independent contractors' could mean one of many things: this could simply mean that the GigSafe employee filled out a form called 'Independent Contractor Enrollment;' it could mean the employee was asked to check a box to describe their role and checked the 'Independent Contractor' box as the box most applicable to their situation; or it could mean the employee signed on a line under a statement reading 'I affirm that I am now or presently intend to become an independent contractor'—or any other number of statements about their relationship with the Openforce customer in question."  (*Id.*)  GigSafe argues that "[t]his is particularly true because Openforce could have provided the precise language of the supposed false statements and has now failed to do so twice." (*Id.* at 4.)  GigSafe argues that "[c]ourts in the Ninth Circuit have dismissed fraud claims where a plaintiff failed to specifically quote from or attach documents purportedly containing the alleged misrepresentations."  (*Id.* at 4.)  GigSafe also argues that the FAC "describes generally what the alleged statements were about, but that is not the same as alleging the 'specific content of the false representations.'"  (*Id.*, citation omitted.)  Next, GigSafe argues that "Openforce also fails to specifically plead to whom the allegedly fraudulent statements were made."  (*Id.*)  GigSafe argues that "Openforce will likely argue that it can be inferred that the alleged misrepresentations were made *to Openforce*" but that "this unwarranted inference is not supported by the" FAC, which instead "points to . . . the Openforce *customer*" as the "recipient of the alleged representations." (*Id.* at 5.)  Specifically, GigSafe argues that paragraph 36 of the FAC "alleges that Defendants got 'inside' of Openforce's systems 'by posing as independent contractors and procuring *customer-specific* activation codes' allowing them to access '*customer-specific* workflows.'"  (*Id.*, quoting Doc. 37 at 16 ¶ 36.)  GigSafe contends that paragraph 38 makes similar allegations and that, "in one

instance, Openforce actually alleges that the alleged misrepresentation about serving as an independent contractor was made in a contract between the GigSafe employee *and Company A*—not Openforce." (*Id.*)  GigSafe also argues that, in Count Four, "Openforce alleges that GigSafe employees 'represented'—without specifying to whom—'that each would serve as independent contractors for certain of *Openforce's clients*.'"  (*Id.*, citing Doc. 37 at 31 ¶ 78.)  And GigSafe also argues that the FAC alleges "that Openforce does not even review enrollment documents, 'especially because it is ultimately *the decision of the Openforce client to decide* whether to accept the enrollment." (*Id.*, citing Doc. 37 at 32 ¶ 83.)  GigSafe argues that "[t]aken together, these allegations do not identify Openforce as the recipient of the allegedly fraudulent statements; instead, they suggest it was Openforce's customer who reviewed and decided whether to accept the representations in the enrollment."  (*Id.* at 6, cleaned up.)  And GigSafe argues that "[i]f the alleged misrepresentations were not made to Openforce but instead to an Openforce customer, . . . they take on an entirely new meaning, and cannot plausibly support the elements of the hearer's ignorance of the representation's falsity, the listener's reliance on the representation's truth and the right to rely on it."  (*Id.*, cleaned up.)  GigSafe argues that although the FAC "describes a 'system of checks to ensure the person is who they say they are,'" the FAC "never actually alleges that [Openforce] reviews the 'thousands of independent contractor[]' enrollments that come through its system and grants access to the system in reliance on them."  (*Id.*, quoting Doc. 37 at 32 ¶ 83.)  Instead, GigSafe argues that "Openforce acknowledges that it is the Openforce customer who ultimately approves the enrollment and allows the purported independent contractor into the system," and therefore "[t]hese allegations are inconsistent with reasonable reliance necessary to support a fraud claim."  (*Id.*)  Last, as for the "where" requirement, GigSafe argues that "[f]or the most part, Openforce only broadly claims that the alleged misrepresentations were made in the 'enrollments.'  But elsewhere, the enrollments are described as entailing multiple documents, steps, and processes."  (*Id.* at 6-7.)  GigSafe argues that "[t]his sweeping approach does not satisfy the specificity Rule 9(b) demands" and that "[i]t is unclear where

and how in the enrollment process the statements were allegedly made: were they affirmative written statements crafted by a GigSafe employee, or were they hidden within the fine print in a clickwrap agreement to access the Openforce system?  Or, alternatively, were they in documents that were not directed to Openforce at all but to some other party?" (*Id.* at 7.)  GigSafe argues that certain allegations in the FAC suggest the statements were made to Openforce customers, not Openforce, which is "why these questions matter." (*Id.*)

In response, Openforce argues that it has sufficiently pleaded the "who," "what," "where," "when," how," and "why" requirements of Rule 9(b).  (Doc. 53 at 1-2.) Openforce contends that "GigSafe's motion to dismiss claims that this detailed information is not enough under Rule 9(b) and Openforce needed to include verbatim quotes from those documents or attach the documents themselves to the FAC" but that (1) "GigSafe is wrong on the facts—Openforce did quote some of the false statements"; and (2) "GigSafe is also wrong on the law" because the Ninth Circuit does not require "that the identification [of the who, what, when, where, how, and why] contain quotes or attachments." (*Id.* at 2.)  Put differently, Openforce encourages the Court to reject GigSafe's "ultra-heightened interpretation of the proper pleading standard under Rule 9(b)." (*Id.*)  Next, Openforce argues that GigSafe's arguments "fail[] for three independent reasons." (*Id.* at 4.)  First, Openforce argues that "the FAC does everything that Rule 9(b) requires: it provides the who, what, why, when, and how of GigSafe's fraudulent misrepresentation, including describing the 'specific content' of those false representations." (*Id.*)  Openforce argues that the FAC "details across multiple paragraphs the relevant facts of its fraudulent misrepresentation claim that meets this standard." (*Id.* at 5.)  As for the "who" requirement, Openforce argues that the FAC identifies "six specific GigSafe employees . . . who falsely identified themselves to Openforce as independent contractors of Openforce's customers" and that "[c]ourts in this District have held that similar misrepresentation claims based on a defendant's alleged false representations about their employment are sufficient to plead a misrepresentation claim." (*Id.*)  Next, Openforce argues that the "what" requirement is satisfied because the FAC alleges that the GigSafe employees "pos[ed] as independent

contractors even though they were actually GigSafe employees—and none of them ever performed any, or even intended to perform any, independent contractor duties for Openforce's customers." (*Id.*)  As for the "where" requirement, Openforce argues that the GigSafe employees "falsely enroll[ed] online as independent contractors for Openforce's customers by signing enrollment forms (such as W-9s, insurance forms, and independent contractor agreements)." (*Id.* at 6.)  Next, Openforce argues that the "when" requirement is satisfied because the complaint alleges "specific dates from January 2024 to May 2025 on which GigSafe personnel accessed Openforce's systems." (*Id.*)  As for the "how" requirement, Openforce argues that "to access Openforce's workflows, the six individuals signed enrollment forms (such as W-9s, insurance forms, and independent contractor agreements) falsely stating they were independent contractors for Openforce's customers." (*Id.*)  And as for the "why" requirement, Openforce argues that "none of the GigSafe personnel who made these misrepresentations ever worked for Openforce's customers as independent contractors." (*Id.*)  Second, Openforce argues that GigSafe "puts forth extended pleading requirements above what Rule 9(b) requires." (*Id.* at 7, cleaned up.) Specifically, Openforce argues that "GigSafe's motion to dismiss incorrectly argues that the law requires either verbatim quotes of the alleged misrepresentations or attached copies of documents containing those misrepresentations." (*Id.*)  To that end, Openforce argues that "the FAC does quote numerous fraudulent statements," "[b]ut more fundamentally, GigSafe misstates the law, as the applicable authority requires identifying the fraudulent statements in some way that puts the defendants on sufficient notice, not just the narrow ways of quoting or attaching them." (*Id.*)  Openforce then seeks to distinguish the cases cited by GigSafe, arguing they do not require verbatim quotes or attached documents. (*Id.* at 7-9.)  Third, Openforce rejects GigSafe's argument "that since an Openforce customer must ultimately accept an independent contractor to work, its fraudulent statements must be directed to Openforce's customers, rather than Openforce." (*Id.* at 10.)  Openforce argues that "[t]his misstates Openforce's claim, which alleges that GigSafe and its personnel made these misrepresentations to Openforce in the course of—and for the

purpose of—improperly accessing Openforce's customer workflows." (*Id.*) Openforce also rejects GigSafe's reliance on the final clause of paragraph 83 of the FAC—which provides that "it is ultimately the decision of the Openforce client to decide whether to accept the enrollment"—arguing instead that "whether a *customer* ultimately decides whether to *hire* an independent contractor has nothing to do with the core allegation of Openforce's fraudulent misrepresentation claim: that GigSafe personnel falsely represented in Openforce's workflows that they were actual, or would-be independent contractors for Openforce's customers accessing Openforce's workflows for that reason, when in fact none of them were." (*Id.*) Openforce also argues that "Openforce is the hearer of the GigSafe employees' misrepresentations," "so any requirement . . . that a falsehood be directed to the plaintiff is satisfied here." (*Id.* at 11.)

In reply, GigSafe argues that (1) Openforce's "Opposition does not identify any allegation that any purportedly fraudulent statement about being an Independent Contractor was made *to Openforce* rather than to Openforce *customers*"; (2) "Openforce does not supply the 'specific content' of any alleged misrepresentation, offering only high-level descriptions"; (3) "Openforce does not identify where the alleged misrepresentations appear, instead referring broadly to its entire system"; and (4) "the Opposition is silent on [GigSafe's] Motion's assertion that the [FAC] fails to allege the required element of reliance." (Doc. 54 at 1.) As for the "who" requirement, GigSafe reiterates that "nowhere in the [FAC] does Openforce explicitly allege that purportedly fraudulent statements were made *to Openforce*. Instead, the [FAC] reads as though statements about serving as an Independent Contractor were actually directed to Openforce customers." (*Id.* at 1-2.) And GigSafe reiterates that paragraph 83 of the complaint supports that "it is ultimately the customer who decides whether to accept an enrollment," and thus "the customer—not Openforce—is the recipient of the document containing the alleged misrepresentation." (*Id.* at 2.) GigSafe also rejects Openforce's characterization of paragraph 83, arguing that "[n]either Paragraph 83 of the [FAC] nor GigSafe's arguments relating to that paragraph say anything about 'hiring' decisions." (*Id.* at 3.) GigSafe reiterates that "if the statements

- 16 -

were only made in enrollment documents that were directed to customers (not Openforce) no fraud claim exists." (*Id.* at 4.)  GigSafe argues that "[t]aken with the totality of the [FAC]—which alleges that statements were made in contracts with customers, that enrollments were done at the invitation of customers, that customers decide whether to accept enrollments, and that customers breached obligations to Openforce by disclosing to Defendants information relating to Openforce's workflows, including their design and how to access them—those allegations are more consistent with the notion that customers, not Openforce, received the information." (*Id.*, cleaned up.)  Next, GigSafe argues that Openforce's opposition "is silent on Openforce's failure to plead reliance." (*Id.* at 5, cleaned up.)  Specifically, GigSafe argues that because the FAC "leads to the conclusion that alleged statements about independent contractor status were made to customers, not Openforce . . . the pleading fails to allege essential elements of fraud under Arizona law: namely, the hearer's ignorance of the representation's falsity, the listener's reliance on the representation's truth, and the right to rely on it." (*Id.*) GigSafe argues that "[a]lthough the [FAC] refers in passing to Openforce's overarching 'system of checks,' Openforce does not allege that Openforce received, reviewed, or relied upon any particular representations provided by any particular employees at the time they were made." (*Id.*, citation omitted.)  Next, GigSafe reiterates its argument that the FAC "does not allege the specific content of the false representations, instead supplying only fleeting references to misrepresentations made as to two customers." (*Id.*, cleaned up.)  GigSafe rejects Openforce's argument that the "what" requirement is satisfied because the FAC alleges that the GigSafe employees "pos[ed] as independent contractors." (*Id.* at 5-6.)  And GigSafe argues that the Court's prior order dismissing Openforce's fraudulent misrepresentation claim, as well as other cases, "recogniz[e] that allegations that a defendant 'misrepresented' the true nature of an underlying characteristic, quality, or intention are not synonymous with 'specific content.'" (*Id.* at 6.)  Next, GigSafe seeks to distinguish the cases cited by Openforce.  (*Id.* at 7-8.)  GigSafe also argues that Openforce's argument that GigSafe has set forth "extended pleading requirements . . . rests on three fallacies": (1) "GigSafe did not argue that 'the law

requires' dismissal 'for failing to quote or attach the documents at issue,'" and "Openforce relies on high-level descriptions of allegedly fraudulent statements 'misrepresenting' the nature of something"; (2) "[o]ther than [two cases], none of the [other] cases Openforce addresses in this portion of the Opposition were even cited by GigSafe as examples of courts commenting on a plaintiff's failure to quote from or attach documents containing fraudulent statements—they were cited in other portions of GigSafe's Motion"; and (3) "it is inaccurate to suggest that the fraud claims in the cases cited were *only* dismissed because the plaintiff failed to meet '*all aspects*' of the who, what, where, when, how, why framework," and "courts within the Ninth Circuit have . . . dismissed a claim where a plaintiff failed on only one or two components of the who, what, where, when, how, why framework." (*Id.* at 8-10.)  In any event, GigSafe argues that "it is not [its] position that a fraud claim must be dismissed for failure to quote from or attach documents containing alleged misrepresentations *even if* it satisfies most or all components of the Rule 9(b) analysis.  GigSafe's position is that Openforce failed on at least three components of the Rule 9(b) analysis—who, where, and what—and that Openforce's failure to quote or attach documents that must be available to Openforce is indicative of Openforce's failure to provide the 'what'—that is, the 'specific content'—of those statements." (*Id.* at 11.)  Last, GigSafe argues that "Openforce simply saying that these statements were made 'in enrollments' or 'workflows' is too sweeping, given Openforce's allegation that those environments consist of multiple documents, steps, and processes.  The Opposition responds with equal generality, contending that the misrepresentations took place 'online' in 'enrollment forms (such as W-9s, insurance forms, and independent contractor agreements)' and 'Openforce's online customer workflows'" but that "[t]his is not an allegation of precise location." (*Id.*)  GigSafe argues that "[c]aselaw requires more than generic references to categories of forms." (*Id.*)

…

…

…

- 18 -

III.    Analysis

GigSafe only challenges the "who,"[3] "what," and "where" requirements of Rule 9(b). (Doc. 48 at 2; Doc. 54 at 1.) The Court takes each requirement in turn.

A.    **"To Whom"**

GigSafe argues that "Openforce . . . fails to specifically plead to whom the allegedly fraudulent statements were made." (Doc. 48 at 4.)

As the Court observed in its order granting in part and denying in part Defendants' original motions to dismiss, the FAC must "allege to whom the representations were made." (Doc. 35 at 45, *citing World Health & Educ. Found. v. Carolina Cas. Ins. Co.*, 612 F. Supp. 2d 1089, 1096-97 (N.D. Cal. 2009).) *See also Derry v. Am. Brokers Conduit*, 2010 WL 432340, *2 (D. Ariz. 2010) (complaint deficient under Rule 9(b) where "it d[id] not specify who said what when and to whom"). GigSafe's primary argument is that paragraph 83 of the FAC shows that Openforce's customers, not Openforce itself, received the alleged misrepresentations, and thus Openforce has failed to adequately plead reliance. (Doc. 48 at 5-6.) The Court disagrees.

Paragraph 83 of the FAC provides:

> Openforce was unaware at the time that the representations of Mr. Thompson, Mr. Gerow, Mr. Kochetkov, Ms. DiGulio, Ms. Tomkins, and Ms. Hicks were false. Openforce processes thousands of independent contractors through its system, and to do so, has implemented a reasonable system of checks to ensure the person is who they say they are and to rely on representations provided by the enrolling independent contractor, especially because it ultimately the decision of the Openforce client to decide whether to accept the enrollment.

(Doc. 37 at 32 ¶ 83.) This paragraph alleges that the alleged misrepresentations made by GigSafe's employees i.e., that they would serve as independent contractors for Openforce's clients, were made "through [Openforce's] system"—i.e., to Openforce. (*Id.*) This paragraph also alleges that Openforce itself, not Openforce's customers, "processes" the

---

[3]    Although GigSafe refers to this as the "who" requirement, GigSafe does not argue that the FAC fails to allege who made the representations but rather to whom those representations were made.

independent contractor enrollments through its system; that Openforce itself "has implemented a reasonable system of checks to ensure the person is who they say they are"; and that Openforce itself "rel[ies] on representations provided by the enrolling independent contractor." (*Id.*) Put differently, paragraph 83, when "construed in the light most favorable" to Openforce, *In re Fitness Holdings Int'l*, 714 F.3d at 1145, supports that the alleged misrepresentations were made to Openforce itself as part of Openforce's system of identity checks and that Openforce relies on those representations.

GigSafe's arguments to the contrary are without merit. First, although the final portion of paragraph 83 states that "it is ultimately the decision of the Openforce client to decide whether to accept the enrollment," the remainder of paragraph 83, when read in the light most favorable to Openforce, alleges that Openforce itself has a system in place to check that independent contractors who enroll in its system are who they say they are. (Doc. 37 at 32 ¶ 83.) That is enough to show that the alleged misrepresentations were made to Openforce. Even if Openforce's customers ultimately decide whether to "accept" the enrollment, i.e., whether to hire the independent contractor (Doc. 53 at 10), that does not change the fact that a representation made by an enrollee about his or her identity is a representation made on Openforce's system to Openforce in the first instance.[4]

Second, the allegations in paragraphs 36 and 38 that the workflows and activation codes are "customer-specific" does not change the fact that the alleged misrepresentations were made to Openforce on Openforce's system. Although the workflows are customer-

---

[4] In reply, GigSafe argues that paragraph 83 says nothing about "hiring" decisions. (Doc. 54 at 3.) Although the term "hiring" is not used explicitly, the FAC suggests there are at least two parts to the enrollment process: (1) a person seeks to register or enroll in Openforce's system as an independent contractor, at which point Openforce checks that they are who they say they are (and relies on the representations made by the putative enrollee for purposes of that determination); and (2) Openforce's customer later decides whether to "accept" the enrollment. (Doc. 37 at 32 ¶ 83.) Whether the customer "accepts the enrollment" of the independent contractor or "hires" the independent contractor appears to be a distinction without a difference. In any event, the Court must construe the FAC in a light favorable to Openforce, and even if one plausible reading of paragraph 83 is that an Openforce customer "accepting" an independent contractor's enrollment is synonymous with the Openforce customer hiring the independent contractor, paragraph 83 still alleges that any initial representations made by a putative enrollee through the enrollment process are representations made to, and relied on by, Openforce.

specific, they are still part of "Openforce's software system" and are "Openforce's proprietary enrollment and onboarding workflows." (Doc. 37 at 3-4 ¶¶ 4-5.) To draw an analogy, if a person signed up for a Facebook account posing as someone else, and then subsequently sent a friend request to another user, that person might be said to have made two misrepresentations: the first misrepresentation made to Facebook to enter its platform and the second to the other user. Similarly here, it may be that the alleged misrepresentations were made to both Openforce and its customers, but the complaint sufficiently alleges that any misrepresentations were made, at a minimum, to Openforce.[5]

GigSafe also argues that "at least some portions of the [FAC] describe the enrollments as consisting of 'contracts with' an Openforce customer and being initiated 'at the invitation of' an Openforce customer" and thus, "[a]s pleaded, the [FAC] . . . indicates the Customer was the recipient of and actor relying upon statements in the enrollments." (Doc. 54 at 3-4.) But even if certain alleged misrepresentations were made in contracts between GigSafe employees and Openforce's customers, that does not negate the inference that the statements were also made to Openforce, which subsequently relied on them. As discussed, the FAC alleges that Openforce "processes thousands of independent contractors though its system, and to do so, has implemented a reasonable system of checks to ensure the person is who they say they are and to rely on representations provided by the enrolling independent contractor." (Doc. 37 at 32 ¶ 83.)

B.    **"What"**

Although a close call, the Court agrees with Openforce that the allegations in the FAC satisfy the "what" requirement of Rule 9(b). The FAC alleges that "[a]ll six GigSafe employees" (i.e., Gerow, DiGulio, Thompson, Kochetkov, Tomkins, and Hicks) registered for and created accounts with Openforce "by posing as independent contractors." (Doc. 37 at 16 ¶ 37.) The FAC then alleges that these six employees "took the next step in their plan, entering customer specific activation codes and going through the enrollment process

_____

[5]    This conclusion renders it unnecessary to address GigSafe's reliance arguments, which are premised on its argument that the recipients of the alleged misrepresentations were Openforce's customers and not Openforce itself.

and accessing the Openforce systems." (*Id.* at 16 ¶ 38.)  Next, paragraph 38 of the FAC details each specific instance in which these GigSafe employees enrolled as "Independent Contractors" (or some other customer-specific variation of that term).  (*Id.* at 17 ¶ 38 [Kochetkov "pretend[ed] to be an independent contractor 'Delivery Partner'" for Customer A]; *id.* [Thompson twice enrolled as a "Delivery Partner" for Customer A]; *id.* [DiGulio enrolled as a "Delivery Partner" for Customer A]; *id.* at 18 ¶ 38 [Thompson enrolled as a "Contractor" for Customer B]; *id.* [Thompson "enrolled twice as a 'Motor Carrier' for Customer C"]; *id.* at 19 ¶ 38 [Thompson "fraudulently enroll[ed] as a 'Field Representative' for Customer D"]; *id.* at 19-20 ¶ 38 [Thompson thrice enrolled as an "Independent Contractor – Courier" for Customer E]; *id.* at 20 ¶ 38 [Thompson enrolled as a "New Contractor (CBC & DS)" for Customer F]; *id.* [Thompson thrice enrolled as a "New Contractor" for Customer F]; *id.* [Gerow enrolled as a "New Contractor" for Customer F]; *id.* [Gerow enrolled as a "Direct IC Owner Operator" for Customer G]; *id.* at 21 ¶ 38 [Thompson and Gerow enrolled as "Contractors" for Customer H]; *id.* [Gerow and Hicks enrolled as "Independent Contractors" for Customer I]; *id.* at 22 ¶ 38 [Tomkins and Gerow enrolled as "Master Contractors" for Customer J]; *id.* [Gerow enrolled as a "Subcontractor" for Customer J].)  The "what" requirement is satisfied for each of these instances because the "specific content" of each alleged misrepresentation is that the GigSafe employee already was, or would serve as, an "Independent Contractor" (or some customer-specific variation of that term) for whichever customer's workflow in which they were enrolling.

GigSafe argues that paragraph 38 of the FAC "provides only vague, summary overviews of the enrollment paperwork with fleeting references to 'misrepresentations made as to two customers (Customers A and B)'"[6] and "contain[s] no allegations or images of the contents of the misrepresentations." (Doc. 48 at 3.)  Not so.  Paragraph 38 of the

_____

[6]    It's unclear why GigSafe argues that the only misrepresentations alleged in paragraph 38 relate to Customers A and B.  The Court views paragraph 38 as alleging that, for Customers A-J, GigSafe employees misrepresented that they would serve as independent contractors for those customers by enrolling as "Independent Contractors" (or some other customer-specific variation of that term).

FAC alleges several specific instances in which GigSafe employees enrolled to access customer-specific workflows by representing that they already were, or would serve as, "Independent Contractors" (or some other customer-specific variation of that term). The fact that paragraph 38 does not just use the general term "Independent Contractor," but instead identifies the *customer-specific position*, identified in quotation marks, that each GigSafe employee enrolled as, shows that Openforce's allegations are not generalized. And in case it wasn't clear from paragraph 38 alone, paragraph 80 explains that "access to Openforce's proprietary enrollment platform is conditioned on the individuals' representation that they are using the system for the purposes of serving as an independent contractor." (Doc. 37 at 31 ¶ 80. *See also id.* at 13 ¶ 25 [use of customer-specific activation codes and access to the customer-specific enrollment workflows "is authorized only by actual independent contractors seeking work with Openforce's customers" and "[u]sing activation codes to access the particularized workflows of any customer for any other purpose—such as to misappropriate Openforce's Trade Secrets—is forbidden by an end user license agreement, to which all would-be contractors must agree before accessing Openforce's system to begin on-boarding"].) In other words, when each of the six GigSafe employees accessed Openforce's system and entered Openforce's customer-specific workflows, they represented that they would serve as an independent contractor for Openforce's customers.

Several other paragraphs in the FAC underscore that the "specific content" of the alleged misrepresentations is that the GigSafe employees represented that they were, or would serve as, independent contractors for various Openforce customers. For example, paragraph 78 of the FAC provides that the six GigSafe employees "in each of the enrollments on each of the dates identified above, represented that each would serve as independent contractors for certain of Openforce's clients." (*Id.* at 31 ¶ 78.) This allegation, taken with the others identified above, is sufficient to meet Rule 9(b)'s requirement that the FAC allege the "specific content of the false representations." *Swartz*, 476 F.3d at 764.

GigSafe seemingly attempts to impose an even more stringent standard than what Rule 9(b) requires, arguing that "Openforce could have provided the precise language of the supposed false statements and has now failed to do so twice" and that "[c]ourts in the Ninth Circuit have dismissed fraud claims where a plaintiff failed to specifically quote from or attach documents purportedly containing the alleged misrepresentations." (Doc. 48 at 4.) To the extent GigSafe is arguing that Rule 9(b) requires a complaint to quote the alleged misrepresentation verbatim or attach the document in which the representation was made,[7] that argument is without merit. *See, e.g.*, *Lucas v. IBM Corp.*, 2020 WL 4569461, *6 (N.D. Cal. 2020) ("A plaintiff need not provide verbatim quotations of purported misrepresentations to satisfy Rule 9(b); it is enough that Lucas has alleged the substance of IBM's alleged representations."); *Bilodeau v. McAfee, Inc.*, 2013 WL 3200658, *9 (N.D. Cal. 2013) ("[T]his Court has found that Rule 9(b) can be satisfied without direct quotations, provided that the complaint's allegations are sufficiently specific."); *Cornerstone Staffing Sols., Inc. v. James*, 2013 WL 12124381, *6 (N.D. Cal. 2013) ("[A]lthough no attempt is made to quote James verbatim, the general content of his alleged misrepresentations to Mary Anderson, CornerStone's owner, are outlined. The complaint goes into detail about James' alleged schemes, going so far as to identify the particular interest rates he promised CornerStone and the returns it actually received. It goes well beyond notice pleading and is specific enough to give him notice of the particular misconduct so that he can defend against the charge and not just deny he has done anything wrong.") (cleaned up); *Kowalsky v. Hewlett-Packard Co.*, 771 F. Supp. 2d 1138, 1143 (N.D. Cal. 2010), *vacated in part on reconsideration on other grounds*, 771 F. Supp. 2d 1156 (N.D. Cal. 2011) (noting that "Plaintiff could have provided greater specificity" or "could have provided quotes" but concluding that Plaintiff's allegations "that the representations contained statements regarding the specific page-capacity and

---

[7] In its reply brief, GigSafe disputes that it has ever "argue[d] that 'the law requires' dismissal 'for failing to quote or attach the documents at issue.'" (Doc. 54 at 8.) The Court appreciates this clarification, but it was reasonable for Openforce to construe GigSafe's motion as advancing this exact argument.

copying/scanning speed of the printer" was sufficient to satisfy Rule 9(b)).

The cases cited by GigSafe on this point in its opening brief are distinguishable. In *Edwards v. Marin Park, Inc.*, 356 F.3d 1058 (9th Cir. 2004), "the complaint ma[de] out the time and place Marin Park's purportedly fraudulent '7 Day Legal Notices' were delivered and names the parties involved, [but] it contain[ed] not a word of the notices' specific contents. Nor did Edwards attach the notices to her complaint or to any other filing in this case." *Id.* at 1066. In contrast, the FAC alleges the specific content of the alleged misrepresentations by identifying the customer-specific position each GigSafe employee enrolled as (Doc. 37 at 16-22 ¶ 38), by alleging that each GigSafe employee "represented that each would serve as independent contractors for certain of Openforce's clients" (*id.* at 31 ¶ 78), and by alleging that "access to Openforce's proprietary enrollment platform is conditioned on the individuals' representation that they are using the system for the purposes of serving as an independent contractor" (*id.* at 31 ¶ 80). Meanwhile, in *Baca v. Johnson & Johnson*, 2020 WL 6450294 (D. Ariz. 2020), "[t]he Complaint generally allege[d] that Defendants fraudulently misrepresented the Product's characteristics to Plaintiff, her physicians, healthcare providers, and the Food and Drug Administration" but "[t]he only documents mentioned, the Product's brochures and instructions for use, [were] quoted as saying that the Product's known complications are 'rare' and 'small.' Beyond this, nothing in the Complaint details the specific content of these documents, when they were made, nor the identities of the key parties." *Id.* at *5. In contrast, the FAC sufficiently alleges the parties to the misrepresentations and when the misrepresentations were made, and the allegations in the FAC also identify the specific position for which each GigSafe employee enrolled (Doc. 37 at 16-22 ¶ 38) and explain that each GigSafe employee claimed to be using Openforce's systems for the purposes of serving as an independent contractor (*id.* at 30 ¶¶ 78, 80). These allegations are more specific than the vague and generalized allegations in *Baca*. Last, in *Silving v. Wells Fargo Bank*, 800 F. Supp. 2d 1055 (D. Ariz. 2011), "the specific content [was] not present for all alleged statements," *id.* at 1074, but that is not the situation here for the reasons discussed above.

- 25 -

Nor do the cases cited in GigSafe's reply brief compel dismissal.  For example, GigSafe cites the portion of Court's order at Doc. 35 that dismissed the fraudulent inducement claim in Openforce's original complaint.  The Court concluded that claim failed to satisfy "the 'what' requirement" under Rule 9(b) because it "fail[ed] to allege the content of any misrepresentations, and instead generally allege[d] that 'Pickerell and Para misrepresented to Openforce that it was interested in a potential corporate transaction.' These allegations fail to state what was said by Pickerell and/or GigSafe." (Doc. 35 at 45, citation omitted.)  But that is a far cry from the situation here, where the FAC provides specific details about what was said by the various GigSafe employees, including the titles of the various independent contractor positions they were falsely claiming to hold or pursue and the identities of the customers associated with those positions.  For similar reasons, GigSafe's reliance on *Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643 (9th Cir. 2019), is misplaced.  There, the plaintiff alleged that the "defendants misrepresented the basis of the premiums they charged" but did not "allege the details of these misrepresentations, such as when defendants made them, where or how defendants made them, to whom they were made, or the specific contents of the misrepresentations."  915 F.3d at 668.  In contrast, and as discussed above, the "specific content of the false representations," *Swartz*, 476 F.3d at 764, is adequately alleged here.

To that end, the Court finds *Xfinity Mobile v. GlobalGuruTech LLC*, 2023 WL 3998459 (D. Ariz. 2023), persuasive.  There, the defendant, GGT, argued that the plaintiff, Xfinity, "failed to plead its fraud and fraudulent misrepresentation claim with sufficient particularity." *Id.* at *4.  "GGT specifically criticize[d] the Complaint's lack of specificity about: what misrepresentations were made, which defendant made them, and when they were made; how the cell phones were fraudulently acquired from Xfinity or who ordered them; how the phones were stolen." *Id.*  The court disagreed, holding that "[t]he Complaint alleges GGT ha[d] used fake or stolen identities to 'steal' or wrongfully acquire Xfinity cell phones" and that the "what" and "how" requirements of Rule 9(b) were satisfied because the complaint alleged "representations that GGT was a real Xfinity customer to

acquire the cell phones." *Id.* Here, similarly, Openforce alleges that GigSafe employees falsely represented that they were real independent contractors seeking work with Openforce's customers.[8]

Last, the FAC contains several other allegations of misrepresentations that separately satisfy Rule 9(b). For example, the FAC alleges that "Thompson signed an independent contractor agreement with Company A, misrepresenting that he would be performing services for Customer A" and that Thompson, "in an insurance coverage form identified Mr. Pickerell—his 'Work Colleague'—as the policy's beneficiary." (Doc. 37 at 17 ¶ 38.)[9] In other words, the FAC alleges the specific documents in which Thompson made alleged misrepresentations. Similarly, the FAC alleges that Thompson, with respect to Customer B, "signed a document misrepresenting that he operated his own 'independent business' and that he was 'providing service for or in connection with' Company B 'as an independent contractor.'" (*Id.* at 18 ¶ 38.) Although the FAC does not attach this

[8]     GigSafe's attempts to distinguish *Xfinity* are unpersuasive. First, GigSafe argues that, in *Xfinity*, the defendants "were 'using fake or stolen identities' to masquerade as Xfinity customers," whereas here, "GigSafe employees used their actual identifying information." (Doc. 54 at 7.) That argument misses the point. The GigSafe employees may have used their real names, but they still provided false information by posing as current or would-be independent contractors for Openforce's customers. Second, GigSafe argues that "the fraud claims in *Xfinity* were premised upon placing orders that required acceptance of Xfinity's Terms and Conditions, in which defendants agreed to specific language that their conduct ultimately violated" and that "Xfinity attached the full Terms and Conditions . . . to its pleading." (*Id.*) Although Openforce did not attach its terms and conditions to the FAC, the FAC does allege that "access to Openforce's proprietary enrollment platform is conditioned on the individual's representation that they are using the system for the purposes of serving as an independent contractor" (Doc. 37 at 31 ¶ 80) and that each of the six GigSafe employees "represented that each would serve as independent contractors for certain of Openforce's clients" (*id.* at 31 ¶ 78). The FAC also alleges that "[u]se of [customer-specific activation] codes and access to [Openforce's] systems is authorized only by actual independent contractors seeking work with Openforce's customers" and that "[u]sing activation codes to access the particularized workflows of any customer for any other purpose—such as to misappropriate Openforce's Trade Secrets—is forbidden by an end user license agreement, to which all would-be contractors must agree before accessing Openforce's systems to begin on-boarding." (*Id.* at 13 ¶ 25.) Again, that is sufficient under Rule 9(b).

[9]     There are several similar allegations in the FAC referring to GigSafe employees filling out customer-specific insurance forms and identifying Pickerell (or some variation of Pickerell) as the beneficiary on those forms and/or using a GigSafe-associated address on the forms. (*See, e.g.*, Doc. 37 at 18 ¶ 38 [Customer B]; *id.* at 19 ¶38 [Customer D]; *id.* at 20 ¶ 38 [Customer F].)

document or give its title, the FAC does quote verbatim the alleged misrepresentation from that document. And the FAC also alleges that, with respect to Customer F, Thompson "filled out a W-9 form on behalf of Para Inc." as well as "an auto insurance form" and a "Logistics-Carrier Agreement." (*Id.* at 20 ¶ 38. *See also id* at 21 ¶ 38 [similar allegations for Customer H].) Once again, these allegations point to, and in some instances quote from, specific documents in which alleged misrepresentations were made.

      C.    **"Where"**

Although another close call, the Court agrees with Openforce that the allegations in the FAC satisfy the "where" requirement of Rule 9(b). GigSafe argues that the FAC fails to satisfy this requirement because, "[f]or the most part, Openforce only broadly claims that the alleged misrepresentations were made in the 'enrollments.' But elsewhere, the enrollments are described as entailing multiple documents, steps, and processes." (Doc. 48 at 6-77.) GigSafe's argument appears to be that, in order to satisfy Rule 9(b), the FAC must identify the specific documents/contracts in which the alleged misrepresentations were made. (*Id.* at 7.) But both of the cases cited by GigSafe in support of that argument are distinguishable. In *King v. Julia Owner LLC*, 2025 WL 2959490 (D. Ariz. 2025), the court held that the complaint must identify "the specific documents" because the complaint only vaguely alleged that "the defendant and their agent(s) fabricated documents, made false representations, and omitted material facts." *Id.* at *3 (cleaned up). And in *SinglePoint Direct Solar LLC v. Curiel*, 2022 WL 331157 (D. Ariz. 2022), the amended complaint "refer[red] to 'concealed facts that were material to the transactions contemplated in their contracts,' but fail[ed] to specifically identify the contracts." *Id.* at *32. In contrast, the FAC alleges that the misrepresentations were made in Openforce's system. Although the FAC does not always identify the specific forms/documents in which those misrepresentations were made, it does identify the customer-specific workflows within Openforce's system in which they were made. The presence of these allegations renders this case analogous to other cases within the Ninth Circuit holding that it is sufficient under Rule 9(b) to alleged that the challenged misrepresentations were made on

"websites" or "systems." *See, e.g.*, *Xfinity*, 2023 WL 3998459 at *4 ("where" requirement of Rule 9(b) satisfied where the complaint alleged that misrepresentations were made "through Xfinity's system"); *Santoro v. Endologix Inc.*, 2020 WL 6295077, *13 (D. Or. 2020), *report and recommendation adopted sub nom.*, 2020 WL 6287473 (D. Or. 2020) ("Based on this standard, plaintiff has pleaded his fraud claim with sufficient particularity. Plaintiff has specified the time and place of each alleged misrepresentation, noting that they occurred in defendant's annual update and within its website and marketing materials prior to plaintiff's endovascular repair."); *Kowalsky*, 771 F. Supp. 2d at 1143 (although the FAC could have "described more precisely where on HP's website [the plaintiff] read the statements, or even provided a URL address at which those statements may be found," the FAC nonetheless satisfied Rule 9(b)'s "where" requirement).  Moreover, to the extent some courts have suggested that a complaint must "describe where on the website" the alleged misrepresentation may be found, *Barfuss v. Live Nation Ent., Inc.*, 2025 WL 1843207, *6 (C.D. Cal. 2025),[10] Openforce has not simply alleged that the misrepresentations were made in some unspecified location within Openforce's entire system.  Instead, the FAC painstakingly identifies each customer-specific workflow/enrollment in which each misrepresentation may be found.  Additionally, although not true for every alleged misrepresentation, the FAC does identify the specific documents within those customer-specific workflows where at least some of the alleged misrepresentations may be found. (*See, e.g.*, Doc. 37 at 17 ¶ 38 [independent contractor agreement with Company A]; *id.* [insurance coverage form]; *id.* at 18 ¶ 38 [document in which Thompson allegedly misrepresented that he operated his own "independent business" and that he was "providing service for or in connection with" Company B "as an independent contractor"]; *id.* [insurance form]; *id.* at 19 ¶ 38 [insurance form]; *id.* at 20 ¶ 38 [W-9 form]; *id.* [auto

---

[10]    *See also Benanav v. Health Paws Pet Ins., LLC*, 2021 WL 4319447, *10-11 (W.D. Wash. 2021) (concluding that the "general reference to Healthy Paws' representations 'on its website and in its marketing materials'" did not satisfy Rule 9(b) and noting that it was "puzzling why Plaintiffs continue to speak in generalities rather than expressly identify the FAQ Page, the Sample Policy, or other materials as the specific documents they reviewed and relied upon").

insurance form]; *id.* [occupation accident insurance form]; *id.* [Logistics-Carrier Agreement]; *id.* at 21¶ 38 [W-9 and insurance enrollment forms].)  These allegations in the complaint, taken together, are sufficient to satisfy Rule 9(b)'s "where" requirement.

Accordingly,

**IT IS ORDERED** that GigSafe's motion to dismiss (Doc. 48) is **denied**.

Dated this 30th day of June, 2026.

Dominic W. Lanza
United States District Judge

- 30 -